UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JEROME SUEING,

                Petitioner,                Case No. 1:08-cv-932

v.                                      Honorable Janet T. Neff

KEN McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. At the time he filed his habeas application, Petitioner was serving a prison term of five to eight years, imposed by the Kent County Circuit Court on January 18, 2006, after a jury convicted Petitioner of indecent exposure, MICH. COMP. LAWS § 750.335a, which resulted in his being convicted of being a sexually delinquent person, MICH. COMP. LAWS § 750.10a. In his *pro se* petition, Petitioner raises 27 grounds for relief, as follows:

    1.     WHETHER THE TRIAL COURT DENIED MR. SUEING HIS CONSTITUTIONAL RIGHT TO COUNSEL AT "CRITICAL-STAGES" OF THE PROSECUTION WHERE THERE WAS NO VALID WAIVER OF COUNSEL?

    2.     WHETHER DENIAL OF DEFENDANT'S REQUEST TO RECALL WITNESSES FOR FURTHER EXAMINATION DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE HIS ACCUSER AT TRIAL?

    3.     WHETHER THE TRIAL COURT ERRED BY DENYING DEFENDANT'S REQUEST FOR A CORPORAL "LINEUP" PRIOR TO HIS PRELIMINARY EXAMINATION?

4.      WHETHER DEFENDANT WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL (1) FAILED TO FILE ANY PRE-TRIAL MOTIONS, (2) FAILED TO REQUEST A LINEUP PRIOR TO THE PRELIMINARY EXAMINATION, (3) ANNOUNCED THAT HE WAS SATISFIED WITH THE JURY, WITHOUT DEFENDANT'S PRIOR APPROVAL OR CONSULTATION, (4) FAILED TO ASK SPECIFIC QUESTIONS DURING CROSS-EXAMINATION, (5) FAILED TO INTERVIEW AND SUBPOENA CERTAIN WITNESSES, AND (6) REFUSAL TO PROVIDE DEFENDANT WITH INFORMATION HE OBTAINED ON DISCOVERY?

5.      DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF ACCESS TO THE COURTS, WHERE THE KENT COUNTY CORRECTIONAL FACILITY DENIED HIS MANY REQUESTS FOR ACCESS TO THE LAW LIBRARY AND NECESSARY LEGAL MATERIALS IN ORDER TO ALLOW HIM TO PROPERLY ASSIST IN HIS DEFENSE WHEN HE HAD COUNSEL AND DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO PREPARE A DEFENSE AND PROPERLY REPRESENT HIMSELF AT TRIAL.

6.      DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

7.      DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO SET FORTH A DEFENSE BY TRIAL COUNSEL'S FAILURE TO SUBPOENA AN "IDENTIFICATION" EXPERT TO TESTIFY AT HIS TRIAL.

8.      DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL AT A "CRITICAL-STAGE" OF THE PROCEEDINGS WHEN THE COURT HAD DEFENDANT "TELL HIS SIDE OF THE STORY" IN A NARRATIVE FASHION [RATHER] THAN THROUGH EXAMINATION BY COUNSEL.

9.      THE PROCESS USED TO ALLOCATE PROSPECTIVE JURORS FROM A MASTER SOURCE LIST TO THE CIRCUIT COURT VENIRES VIOLATED DEFENDANT'S SIXTH AMENDMENT [G]UARANTEE OF AN IMPARTIAL JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

10.     DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE THE JURY WAS PERMITTED OVER OBJECTIONS, TO CONSIDER THE PICTURE

OF A PHOTOGRAPHIC LINEUP PRESENTED BY THE PROSECUTION WITHOUT A FOUNDATION FOR IT[]S ADMISSIBILITY OR APPROVAL FROM THE COURT.

11.   THE TRIAL COURT LACKED JURISDICTION OVER THE SUBJECT MATTER OF THIS CASE BECAUSE THE DEFENDANT WAS NOT ARRAIGNED IN CIRCUIT COURT WITHIN THE TIME FRAME SPECIFIED BY STATUTE.

12.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE A PHOTOGRAPH OF THE CRIME SCE[NE] THAT WAS TAKEN BY DETECTIVES MORE THAN ONE-(1)-YEAR AFTER THE ALLEGED OFFENSE, WHICH HAD NOT BEEN PROVIDED TO DEFENDANT PRIOR TO TRIAL IN VIOLATION OF THE PRETRIAL DISCOVERY ORDER.

13.   DEFENDANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO ASK CERTAIN RELEVANT AND MATERIAL QUESTIONS OF THE VICTIM AND THE TRIAL COURT'S REFUSAL TO ALLOW DEFENDANT TO "RECALL" THESE WITNESSES FOR FURTHER EXAMINATION.

14.   THE PROSECUTION FAILED TO EXERCISE DUE DILIGENCE IN DISCOVERING AND DISCLOSING THE INDENTIY OF A "RES GESTAE" WITNESS.  MCLA 767.40a(2).

15.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONCLUSION THAT THE SUSPECT "KNOWINGLY MADE AN OPEN OR INDECENT EXPOSURE TO THE VICTIM IN THE INSTANT CASE.

16.   WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING INTO EVIDENCE THE TESTIMONY CONCERNING AN UNRELATED CRIME TO PROVE THE DEFENDANT'S SCHEME, PLAN OR SYSTEM IN EXPOSING HIMSELF TO THE COMPLA[I]NANT?

1[7].   THE TRIAL COURT ABUSED IT[]S DISCRETION BY ASSIGNING CHRIS LLOYD DENNIE TO REPRESENT DEFENDANT DURING THE SENTENCING [PH]ASE OF THE TRIAL, WHEN IT WAS APPARENT THAT A TOTAL BREAKDOWN OF THE ATTORNEY/CLIENT RELATIONSHIP EXISTED BETWEEN DEFENDANT AND MR. DENNIE REQUIRING MR. DENNIE TO WITHDRAW FROM THE CASE AND

- 3 -

THE DEFENDANT TO REPRESENT HIMSELF IN THE MIDDLE OF THE TRIAL.

1[8].    THE DEFENDANT IS ENTITLED TO HAVE AN UPDATED PRESENTENCE INVESTIGATION REPORT PREPARED AND SENT TO THE MICHIGAN DEPARTMENT OF CORRECTIONS BECAUSE HIS PSO CONTAINED INACCURATE INFORMATION THAT WAS OBJECTED BY TRIAL COUNSEL AND SAID IT WOULD BE ELIMINATED OR CORRECTED BY THE COURT.

[19.]    [WHETHER THE PROSECUTOR'S EXERCISE OF PEREMPTORY CHALLENGES AGAINST A BLACK FEMALE PROSPECTIVE JUROR CONSTITUTED UNLAWFUL RACE OR GENDER BASED DISCRIMINATION.][1]

[20.]    WHETHER CONTINUANCES AND DELAYS CAUSED SOLELY BY AN INDIGENT DEFENDANT'S PUBLIC DEFENDER CAN ARISE TO A "SPEEDY TRIAL" RIGHT VIOLATION, AND BE CHARGED AGAINST THE STATE PURSUANT TO THE TEST IN BARKER V WINGO, 407 US 514, 530 . . . (1972), ON THE THEORY THAT THE PUBLIC DEFENDERS ARE PAID BY THE STATE?

21.    WHETHER THE RIGHT TO COUNSEL AS ESTABLISHED IN GIDEON V WAINWRIGHT, 372 US 335 . . . (1963), SHOULD RESULT IN BROADER SPEEDY TRIAL RIGHTS TO INDIGENT DEFENDANT[]S THAN DEFENDANT[]S WHO ARE ABLE TO RETAIN PRIVATE COUNSEL, SUCH THAT ONLY DELAYS BY PRIVATE COUNSEL GET CHARGED AGAINST THE DEFENDANT UNDER THE BARKER V WINGO, TEST?

22.    DEFENDANT WAS DENIED THE ADEQUATE ASSISTANCE OF APPELLATE COUNSEL.

23.    THE PROSECUTOR'S QUESTIONS AND ARGUMENT IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF TO THE DEFENDANT.

---

[1]The amended petition docketed by the Court appears to have been missing a page containing the heading for the instant issue.  Relying upon the arguments contained in the petition and the issue as stated in the Respondent's answer to the petition, the Court has phrased the question consistently with Petitioner's other arguments.

24. DEFENDANT DID NOT RECEIVE A FAIR TRIAL WHERE THE PROSECUTOR "MISLEAD" THE JURY DURING HIS REBUTTAL SUMMATION.

25. DEFENDANT WAS DENIED DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE TRIAL COURT WOULD NOT A[]LLOW DEFENDANT TO MAKE CLOSING ARGUMENTS.

26. THE PROSECUTOR'S FAILURE TO PROVIDE THE DEFENDANT WITH A VIDEO OR AUDIOTAPE OF THE CONVERSATION THAT HE HAD WITH OFFICER[]S AFTER HIS ARREST (IN THE BACK SEAT OF THE PATROL CAR) RESULTED IN SUPPRESSION OF FAVORABLE EVIDENCE AND DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO SET FORTH A DEFENSE.

27. DEFENDANT WAS NOT GIVEN SUFFICIENT TRIAL PREPARATION TIME AFTER HIS APPOINTED ATTORNEY WITHDREW TWO-(2)-DAYS INTO THE TRIAL AND DID NOT SURRENDER PAPERS AND OTHER PROPERTY TO WHICH THE DEFENDANT WAS ENTITLED.

(Am. Pet., docket #25, PageID ##185, 189, 193, 197, 200, 205, 208, 211, 213, 215-18, 221-22, 224-25, 229-34, 236.[2])

Respondent has filed an answer to the petition (docket #32) stating that grounds 10 through 27 should be dismissed as time-barred, while the remaining grounds should be dismissed because they are noncognizable or lack merit. Upon review and applying the AEDPA standards, I recommend that the petition be denied.

**Procedural History**

**A.    Trial Court Proceedings**

The state prosecution arose from Petitioner's display of his fully exposed penis to Justine Bandstra in a coffee shop. Petitioner was charged with one count of indecent exposure as

---

[2]Because of an inconsistency in Petitioner's numbering of the grounds for relief, I have corrected the numbers, where necessary, to be sequential.

a sexually delinquent person, with a notice of being a fourth felony offender.  At a preliminary examination on November 5, 2004, the prosecutor introduced evidence that Petitioner had been convicted in 2003 of indecent exposure and being a sexually delinquent person.  (Prelim. Exam. Tr. at 17-18, docket #35.)  Petitioner was bound over on the charge to circuit court for a felony proceeding.  An amended information was filed on November 18, 2004.  (*See* Cir. Ct. Register of Action, docket #34.)

On December 6, 2004, the Court ordered a competency examination of Petitioner. (*Id.*)  After receiving the examiner's report, the defense agreed to stipulate to competency at a hearing held on February 25, 2006.  (Competency Hr'g Tr. at 3-4, docket #36.)  On August 8, 2005, defense counsel sought a brief adjournment of the trial, until September 19, 2005, because Petitioner had not yet been arraigned in circuit court and defense counsel had some witnesses yet to contact. The court granted the motion and proceeded to arraign Petitioner.  (Adjournment Hr'g, docket #37.) The matter was adjourned another week, due to the unavailability of the judge.  (Register of Action, docket #34.)

Petitioner was tried before a jury on the indecent-exposure charge, beginning on September 26, 2005, and concluding on September 27, 2005.[3]  After exercising eight peremptory challenges to jurors, defense counsel expressed his satisfaction with the jury, as did the prosecutor. The jury was sworn, instructed and excused until the following day.  (Tr. I at 67.)  Once the jurors left the courtroom, Petitioner objected to the fact that his attorney had expressed satisfaction with

---

[3]The trial transcripts will be referred to as follows:
"Tr. I" - Trial Transcript Volume I, Sept. 26, 2005 (docket #38),
"Tr. II" - Trial Transcript Volume II, Sept. 27, 2005 (docket #40),
"Tr. III" - Trial Transcript Volume III, Sept. 28, 2005 (docket #41).

the jury without asking him.  Petitioner indicated that he had intended to make a *Batson* challenge, because he did not have three African-American jurors.  One African-American had been excused for cause because she knew Petitioner.  Another African-American, Ms. Willis-Berry, was excused on a peremptory challenge.  (*Id.* at 68.)  In response, the prosecutor noted that one person of color remained on the jury, though that person was not African-American.  (*Id.*)  The prosecutor explained that he had excused Ms. Willis-Berry because she was 21 years old and still in high school, and he was concerned about her ability to understand the court's instructions and participate as a juror.  (*Id.* at 69.)  Petitioner complained that he still had peremptory challenges remaining, and he was not really satisfied.  Defense counsel explained that it had been his experience that a jury selection which dragged on, particularly where, as here, most of the objections were coming from one side, would affect or possibly offend the jury.  (*Id.* at 69-70.)  The judge also explained to Petitioner that, while he had allowed twelve peremptory challenges because a potential life penalty was involved, five challenges was more likely all that were required by Michigan law.  (*Id.* at 70.)  Defense counsel also added that, after excusing the last-challenged juror, he had told Petitioner that, unless someone was called who was problematic, he would be satisfied.  Petitioner made no objection.  Two additional jurors were called to that chair, both of whom defense counsel excused before finally being satisfied with the jury.  (*Id.* at 71.)

Petitioner then complained that the court had not yet ruled on his motion for self-representation.  The court responded,

THE COURT:  All right, well, would you rather represent yourself and have Mr. Dennie just as a legal advisor here?  I mean I'm sure, Mr. Sueing, you've heard the phrase, "The person who represents himself has a fool for a client."  You certainly have the right to do that if you want to.  I'll allow you to do that starting

tomorrow morning if you'd like Mr. Dennie to just sit here and be your legal advisor, and you can handle witnesses' objections, cross-examination –

MR. SUEING:  I was just – I'm concerned with some pretrial motions that he – he never filed one pretrial motion on my behalf.

THE COURT:  Well, what kind of pretrial motions are you talking about?

MR. SUEING:  Okay, I figured I had several, one in reference to identification.  And I went through the preliminary examination, I asked the judge, Honorable Benjamin Logan, whether or not I could have a corporal lineup prior to my – any testimony being taken, and Mr. Logan, Honorable Judge Logan denied my motion, and he said that was something that should be taken up by your attorney. And my attorney didn't request anything, so he rejected that motion, and then the victim came in and identified me as the assailant.

When I called this to Mr. Dennie's attention, and I also located some case law and gave it to him, and he still feels as though that that was not a good enough motion to file in my behalf, but I'm letting him know that I'm the individual that if I get convicted, I'm going to be the individual that's serving time.  I want those certain things on the record so it can be reserved for appeal or review.

Okay, Judge Logan rejected my motion for my request to have a lineup, and I figured that that was wrong, and that tainted the inquired [sic] identification to, that that made it the inquire [sic] identification suggestive and conducive to irreparable mistaken identification.  Now it's forever tainted.  If he could have delayed it for a minute, and if I could have had a lineup, maybe we could have cleared things up.  and now that he refused to give me a lineup, and the victim come in and identified me, I'm the only individual sitting there, so I think the identification is forever tainted now.

THE COURT:  Well, that's something you and your attorney can explore when the victim testifies under oath.  She can be cross-examined on that, and that's an issue for the jury to decide. . . . I mean obviously from what I gather, you and your attorney are claiming that there's misidentification here.  If this incident did occur, you're not the one that was there.

MR. SUEING:  That's what I'm claiming that I wasn't the individual that committed this act.

THE COURT:  Well, and again, that's still the burden of proof on Mr. Benison to prove beyond a reasonable doubt that . . . you're the person, and that's

legitimate cross-examination, and I understand you may have some alibi witnesses testify, and that would further weigh on that issue.

. . .

MR. DENNIE:  Regarding the identification he did give me a case, it was People v. Maire, 42 Mich App 37.  The case is still good law, as far as I could find, but it's just my research found it simply gives the district court, the district judge discretion to order one or not.  If he orders one, the prosecutor can object and have it not given, and if he doesn't give one, defendant doesn't have an absolute right to one.  So I didn't believe that that  – and I still don't believe that that motion has any merit, so I didn't make it.

THE COURT:  Well, and I agree with that, Mr. Sueing.  Any motion like that would have been denied here, and as you say, Mr. Sueing, there may be some potential damage done by Judge Logan denying your request, but it doesn't do any good to order a corporal lineup now, and again, that's a matter for the burden of proof for the prosecution, and cross-examination and credibility of the witnesses.

(*Id.* at 71-75.)  Petitioner also argued that he had been in jail for longer than his possible misdemeanor sentence and that he had been denied a speedy trial.  In response, he was advised that he was being charged as a sexually delinquent person, which had the capacity for a life sentence. (*Id.* at 75-76.)  The court also rejected his challenge under the state 180-day speedy-trial provision, attributing the delays to the defense request for a competency examination and late disclosure of alibi witnesses.  (*Id.* at 77-80.)  Petitioner next requested a *Tucker*[4] hearing to contest the validity of his guilty plea to being a sexually delinquent person on December 18, 2003.  The court deferred any hearing until after a conviction was obtained.  (*Id.* at 80-81.)  In addition, the prosecutor indicated that, because of the government's failure to adequately disclose the potential use of evidence of other

---

[4]In *United States v. Tucker*, 404 U.S. 443, 449 (1972), the United States Supreme Court held that a prior felony conviction that had been obtained without representation by counsel or a valid waiver of counsel, could not be used to support guilt or enhance punishment of another offense.

bad acts, he did not intend to introduce past acts of public indecency in his case in chief. (*Id.* at 82.)

Finally, the court again addressed Petitioner's request for self-representation:

> THE COURT:  Mr. Sueing, what is your choice?
>
> MR. SUEING:  What do you think, your Honor?  I mean you –
>
> THE COURT:  Well I already told you what I think.  It's your choice, and again, I do not think it would be a wise decision to be your own attorney.  You've got experienced trial counsel here who is trained, and I know, Mr. Sueing, that you've done a lot of legal work on your own and that you know the law better than most lay persons, but you've got experienced trial counsel here.  My personal opinion is I think you're better off retaining him as your counsel, but on the other hand, it is your choice, and I can't prohibit you from acting as your own attorney.  That's your right.  And you're an intelligent person, obviously, and you know what your rights are, and you know what's at stake here.
>
> MR. SUEING:  Yeah, I know an individual should have competent and effective counsel.  I often look at, I read a book one time about Clarence Darrell [sic], he was a super kind of defense attorney at the turn of the [c]entury.  When he was accused of violating the law, the first thing he did was hire him an attorney.  But he wasn't in the situation I was in.  F. Lee Bailey the same thing, Johnnie Cochran.  F. Lee Bailey was charged with drunk driving, he hired this attorney that O.J. Simpson had.  I can't recall his name exactly, but all attorneys would be trying to hire attorneys.  But I know I've got a lot of experience as a layman, you know.  I'm a licensed paralegal.  I've took cases all the way to the U.S. Supreme Court, several times.  I was one of the only laymen probably to argue a cause before the Third Division of the Michigan Court of Appeals right here in Grand Rapids on a state appeal.
>
> I was allowed to argue a case for another citizen.  I was the first one probably ever to do that.  I did it against Timothy K. McMorrow, the prosecutor here in Kent county.  So he can vouch for whether or not I'm ready to, or whether or not I could represent myself.
>
> THE COURT:  Well, have you ever represented yourself in a trial?
>
> MR. SUEING:  Yes, sir.  Jerome Sueing versus Robert Frazier.
>
> THE COURT:  But I mean as a defendant in a criminal trial, have you ever done that?

MR. SUEING:  In a criminal trial have I represented anybody?  No, not really. But –

THE COURT:  I'm talking have you represented yourself as a defendant in a criminal trial.

MR. SUEING:  I've never represented myself as a defendant in a criminal trial, no. . . . But I know the Rules of Evidence and everything else.

THE COURT:  Again, Mr. Sueing, my personal advice to you and my experienced legal advice would be you're better off not being your own attorney, but again, that's your choice, and that's a choice you're going to have to make.  And I agree with Mr. Benison, he should know so he can prepare his witnesses for tomorrow.

MR. SUEING:  Okay, perhaps I guess I have to still go with Mr. Dennie here. I would imagine I don't have any choice.  I know the jury already has been impaneled this morning.  So if I'm going to have a fool for a client, I – You know maybe if you would have ruled on my motions last week for a private – private trial, I mean Mr. Dennie discussed it, he said that he had talked with you before we came out here and he said he's not going to really say anything about my motion to represent myself. That's the reason why I spoke on it.  I didn't want to just come in here and speak on it with all the prospective jurors out there and I jump and say anything.  I think – I didn't think that but the proper time.  But now the jury has been impaneled this morning, so they seen Mr. Dennie here representing me then, and then if I would come in here tomorrow and start representing myself, they're going to say, hey, what happened to the guy who was supposed to have been his atttorney there representing him.  Is there some kind of fallout in their camp or . . . he don't believe in his innocence or something.

THE COURT:  It could be easily explained, Mr. Sueing, that you used Mr. Dennie's services to help you select the jury, and you wanted to represent yourself. He'd still be sitting here, and that's the normal procedure when the defendant represents himself, that the defense attorney sits there as a legal advisor.  Again, it's your choice, but you do need to make the choice.

MR. SUEING:  Well I can do that between now and tomorrow?

THE COURT:  Well, as Mr. Benison says, he's entitled to prepare his witnesses between now and then for being cross-examined by Mr. Dennie or you. I think that's a fair request by Mr. Benison, so I'm going to require you to make the decision now.

- 11 -

MR. SUEING:  It's a hard decision to make.  If I make this decision and say, well, I'm going to go on ahead and let him handle the case and then turn around and then disagree with him when he go to cross-examine some witnesses, I can't never come back and change my mind, you know, so –

THE COURT:  Well, no, I'm not – Mr. Sueing, if at some point during the trial you're concerned about something, we can always discuss it outside the presence of the jury.

MR. SUEING:  Oh, okay then.

THE COURT:  But I'm, you know –

MR. SUEING:  Then I'm going to –

THE COURT:  Mr. Benison –

MR. SUEING:  Then I'll go with him.

THE COURT:  You'll go with Mr. Dennie?

MR. SUEING:  I'll go with Mr. Dennie.

(*Id.* at 83-88.)

The following morning, Justine Bandstra testified that she was at the Common Ground Coffee House at 1319 East Fulton Street in Grand Rapids on October 5, 2004 at about 4:00 p.m. (Tr. II at 15.)  She was having coffee with her friend Alana, catching up with each other's lives. As they were talking, Petitioner came in and walked over.  Bandstra had seen Petitioner around the neighborhood on perhaps three occasions, and she had spoken to him a couple of times.  (*Id.* at 16, 18, 30.)  Bandstra acknowledged Petitioner, nodding at him, and they spoke.  (*Id.* at 16.)  While she could not recall exactly what they said to each other, she remembered him saying that he recognized her from somewhere, and he was trying to place her.  Petitioner asked about where she worked and other similar questions.  He told her that she was looking good.  Petitioner then sat down at a table

- 12 -

to the side and across from her.  Bandstra continued to talk with her friend, but she became uncomfortable, as she noticed from her peripheral vision that Petitioner was staring at her.  (*Id.* at 16, 24.)  She eventually looked down and saw that Petitioner had exposed his penis and was caressing it up and down, rapidly, while looking at Bandstra.  (*Id.* at 16-17.)  She was very startled, and she immediately told her friend Alana, "We need to go right now," and Alana agreed.  (*Id.* at 17.)  They quickly walked outside, and Bandstra told Alana what had happened.  Bandstra then decided that it was important to go back in and perhaps talk to Petitioner, but he was no longer there.  (*Id.* at 17-18.)  She assumed that he had gone out the back exit, as she had been standing in front of the store.  (*Id.* at 19.)  Bandstra talked to the person at the counter and let them know what had happened so that they could inform the manager.  (*Id.* at 18.)  Bandstra identified Petitioner in the courtroom. (*Id.*)  Bandstra testified that Petitioner previously had told her that his name was "Ron," and the name "Jerome" did not ring a bell when she learned it later in the case.

Bandstra called the police the following day, after she had talked with her parents and friends.  (*Id.* at 19, 24.)  The police asked her to come in two or three weeks later to see if she could identify the suspect.  (*Id.* at 25.)  They showed her a lineup of photographs, and she was able to identify Petitioner within two seconds.  (*Id.* at 20, 25, 29.)  Bandstra identified People's Exhibit 2 as the lineup she was shown.  (*Id.* at 34.)

On cross-examination, Bandstra discussed where and when she previously had met Petitioner.  (*Id.* at 23, 30.)  She believed that Petitioner lived in roughly the same neighborhood, as he would walk by her house on occasion, when she was sitting on her porch, reading.  Petitioner would come and talk to her.  (*Id.* at at 23.)  On one occasion, Petitioner approached her, mentioning that his brother-in-law was a photographer, and he tried to get her information to become a model.

- 13 -

(*Id.* at 30.) She also testified that she had seen Petitioner at a different coffee house downtown. (*Id.* at 23.) Bandstra testified that she had only lived in the house that summer, so she had met him over the three months preceding the incident. The last time she saw him was within two weeks to a month before the offense date. (*Id.* at 30.)

Bandstra testified that the lighting at the coffee house was good. She was sitting by the window, which let in light, and there were lamps on all the tables. (*Id.* at 31.) Bandstra stated that she wore contacts, and she was wearing them on the day in question. (*Id.* at 29.) Using a diagram, and photographs, Bandstra specifically described her location and that of Petitioner, described why she could see Petitioner's groin, and denied that Petitioner was fumbling with a napkin at the time he exposed himself. (*Id.* at 31-33, 36-38.)

Alana Kalinowski testified that she knew Bandstra from college. She met Bandstra on October 5, 2004 at the Common Ground Coffee House in the afternoon, after class, while it was still daylight. (*Id.* at 38-39.) Kalinowski was sitting at the table, facing Bandstra and the window. Kalinowski pointed out on the photographs where she and Bandstra were sitting. (*Id.* at 40.) After they had been talking for about an hour, Bandstra's eyes suddenly bugged out, and she lowered her voice, saying, "We gotta get out of here." When Kalinowski asked, "Why," Bandstra said, "We just gotta go, we gotta go right now." (*Id.* at 39, 41.) Bandstra was shocked and "freaked out," and Kalinowski took a minute to get up to leave. (*Id.* at 41-42.) As they were walking out, Bandstra told her why they were leaving, saying, "That guy over there, he's, I think he's jerking off." (*Id.* at 42-43.) Kalinowski turned around and saw a black man sitting, "I think like putting things away, if you will." (*Id.* at 43-44.) She could not provide a detailed description of the man. (*Id.* at 44.) Outside of the coffee house, Bandstra said, "Well, we shouldn't really tolerate that," so they went back inside

- 14 -

intending to confront the man, but he wasn't there.  They went to the counter and told the person

what had happened and instructed him to tell his manager.  (*Id.* at 44.)  Bandstra told Kalinowski that

she had seen the man around before.  (*Id.* at 50.)

After completing examination of Kalinowski, defense counsel asked to approach the

bench, and the jury subsequently was sent out of the courtroom on a recess.  (*Id.* at 51.)  The court

called on Petitioner, as he had indicated that he had something to say.  Petitioner again objected to

the racial composition of the jury, claiming that he did not have a jury of his peers, in violation of

the Sixth Amendment.  (*Id.* at 52.)  Plaintiff relied upon a case in which a computer glitch that

resulted in fewer black people being called for jury duty in Kent County, and he expressed his

uncertainty whether the error had been corrected.  (*Id.* at 52.)  The court informed Petitioner that the

computer error occurred in April 2001 and was cured in August 2002.  Petitioner argued that he

nonetheless was dissatisfied with the unrepresentative jury.  (*Id.* at 53.)  Petitioner again argued that

his attorney rendered ineffective assistance of counsel when he accepted the jury without asking

Petitioner.  Petitioner also argued that his attorney had not asked the first two witnesses most of the

questions that Petitioner requested.  (*Id.* at 54.)  Petitioner also expressed dissatisfaction with his

attorney's failure to challenge the admission of certain photographs of the coffee shop that showed

chairs moved differently and a man in white pants, claiming that they were slanted.  The court

explained that the jury would decide the credibility of the evidence.  (*Id.* at 55.)  Petitioner then

raised the issue of self-representation for the third time:

> THE DEFENDANT:  Now, questioning these witnesses, man, he's not been
> – I wrote you a letter a few weeks ago telling you that me and my attorney had a
> conflict of interest, and we were at odds over a few things and if I could represent
> myself.

- 15 -

THE COURT:  Do you want to take over now?

THE DEFENDANT:  You never did – I could take over, yes.

THE COURT:  Well, if you want to, that's your right.  That's your right.

THE DEFENDANT:  And he could advise me.

THE COURT:  If you'd like to do that, that's fine.  When we come back in after the recess, you can take the lead role here and Mr. Dennie can be an advisor.

THE DEFENDANT:  But I would like to re-call the witnesses and ask them certain questions.

THE COURT:  Well, those witnesses have been excused, but that's a matter we can take up.  But you need to make the decision whether or not you want to represent yourself.

THE DEFENDANT:  Okay, but then still, again, I'm in a Catch 22 position, your Honor, just like yesterday.  It's either represent yourself or be represented by somebody who I feel is not trying to represent me properly.  So you either have ineffective counsel or represent yourself.  That's no choice.  That's a hard decision to make, your Honor.

The constitution also says I got the right to be represented by counsel, not only a person admitted by the bar, but we're talking about effective counsel.  So I'm put in a position where I'm represented by somebody who has a conflict of interest and he's not looking out for my best interest, where he don't really believe in me, so I don't feel I'll being [sic] represented at all.

THE COURT:  Well, Mr. Sueing, it's the Court's decision that you are receiving effective assistance, but if you want to handle your own case, that's your right.

THE DEFENDANT:  Well, I think from here, your Honor, facing this situation, I'm going to have to take over and I'm going to re-call  the witnesses myself.

THE COURT:  Mr. Dennie, any comments?

MR. DENNIE:  Your Honor, I would just – he brought his list of questions to me.  I addressed them all, save for one.  I told him I wasn't going to insist that she

- 16 -

describe the penis, give a physical description of the actual penis. I didn't ask that. I made that chioce.

If that is decided later to be ineffective, I guess so be it, but I did make that strategic trial choice of possibly offending the jury by asking a person to go into detail on something like that.

I believe I covered every other question that he asked.

I didn't ask them exactly that way, I didn't read them verbatim, but I covered all of the information in those questions.

Other than that, if Mr. Sueing wants to pursue his own case, that's his own right.

THE DEFENDANT: I also asked him to ask other questions of this individual that, depicting that – she testifying that she knew me. I never saw this woman before in my life. She said she used talked to me in the neighborhood, I walked by and talked to her when she was on her porch, and this, that, and the other. I don't even stay in that neighborhood, your Honor.

I want to know the dates that she talked to this guy, when is the last time she'd seen him, and what kind of conversation she had with him. Apparently, from the way she was talking, this person lived in the neighborhood. I do not live in that neighborhood.

My attorney did not cross-examine the witness in that area. I tried to get him to testify, I mean to cross-examine her in that area and find out certain things, and he didn't do that.

This individual talked like she was a student and she talked with this guy after class. I do not go to college, your Honor, I do not go to school.

So there's some things I'm talkin' about I want to get on the record to demonstrate, to show that I wasn't the individual that done this.

THE COURT: All right. Mr. Benison, any comments here?

MR. BENISON: Your Honor, on the racial composition of the jury, it sounds like Mr. Sueing was asking Mr. Dennie to exclude members of the jury based on their race to allow a different racial makeup. I believe that in itself violations *Batson* and would have been not only unethical but illegal for Mr. Dennie to have pursued at Mr.

Sueing's request.  It was properly rejected by counsel as being offensive to the laws of this state and the constitution of the United States.

As far as his self-representation, he obviously has the right to do that.  He also has been advised by this Court and should continue to be so that he who represents himself has a fool for a clinet.  It's a huge risk, given the circumstances here.  Mr. Dennie is an experienced attorney.  I've tried several cases with him.  I've had many encounters with him over the years.  I believe he is a competent attorney.  I believe he is doing a competent job in this case.  He certainly surprised me with a few of the answers he got out of the witnesses.

But I believe that Mr. Sueing's comments, if he does choose to represent himself, will, depending on how they are phrased, I believe the Court will then have to rule on a motion that I will make if he tries to interject claims or facts, that he will be waiving his Fifth Amendment right against self-incrimination and will be forced to take the stand.

He's already made comments about this chair was moved in the photograph, which would indicate that he was in fact present at the scene and knew where the chairs were located.  If he's claiming the chairs were moved, the only way he would know that is if he was present.

I believe that's an admission that he was in fact at the scene and that this alibi is the deception that it actually is, and I believe if he continues that line in front of the jury, I will be entitled to cross-examine him about that under oath.

THE COURT:  Well, let's assume Mr. Sueing goes ahead and represents himself.  What is your position on him re-calling witnesses that have been excused?

MR. BENISON:  Your, Honor, based on the nature of the questions I believe that – the ones that he asked to be raised, Mr. Dennie did cover: "When were your conversations with her?"  I believe he asked that question.  "When was the last time you spoke with him?  And she described it being over the last three months, and the last one was two to three weeks, maybe a month before the incident at the coffee house.  That was covered by Mr. Dennie.

The student issue, I believe what she said was he asked here where did he know her from listed a variety of options.

If he wants to get on the stand and say, "I wasn't a student anywhere at that time and it couldn't have been possible," he certainly can do that, but her answer is what her answer is.  To try to interject that, no, he wasn't actually a student is in fact argument and assuming facts that are not currently in evidence.

- 18 -

The only other description is a detailed description of the penis of the person who she saw.  I guess I fail to see the relevance of that if he's claiming he wasn't there.  She's certainly given enough of a description for the jury to make an assessment of her credibility of what she saw.

I think Mr. Dennie's strategic decision is an appropriate one, and I'm sure I would have objected had he attempted to go that route.

THE COURT:  Mr. Sueing?

THE DEFENDANT:  Yeah, I would just only elaborate on him saying I'm waiving my Fifth Amendment privilege against self-incrimination.  The only reason why I said that, your Honor, about this chair being moved is because in this picture that he proposed, Exhibit Number A, or whatever it is for the State, all the other chairs are around the tables except the one at this table.  That's why I said that.  I didn't say it as an admission.

If you look at the picture, all of the chairs are around these other tables here except this one here (indicating).  This one is pulled back.  that's what I was telling my attorney.  This chair right here is pulled back from the table, where this guy with the white pants is at.  So you can see clearly up under the table.

So I say – make an exception to this chair here being moved.  I didn't say that that was an admission of guilt or that I was at the scene of the crime.  So I would like to state that for the record.

THE COURT:  All right.  Well, Mr. S[ue]ing you do want to represent yourself, correct?

THE DEFENDANT:  Yes.

THE COURT:  All right, we'll make that change, then.  I'll announce that to the jury when we come back in.

As to the jury makeup, we talked about that yesterday.  There was no computer glitch.  The arrays that we are receiving are taken randomly from the proper lists.  The voir dire, in the Court's opinion, was handled properly.  And again, you have been receiving competent representation.  And, as I said yesterday, I probably allowed more preempts than I had to.  So that was to your benefit.

And Mr. Dennie up until now has been your attorney and been acting competently in your behalf, so I see no problem with the jury.

> And I see no reason to re-call the witnesses we have already had.  I'm of the opinion that Mr. Dennie competently cross-examined them, and, and Mr. Benison said, obtained some answers that surprised him that he didn't expect.
>
> I've looked through your list of questions.  All the areas that you have questions on Mr. Dennie covered.  I see this would just be unneeded rehashing of the same issues, replowing the same ground.

(*Id.* at 55-63.)  Following a recess, the court confirmed that Petitioner still wished to represent himself.  He then warned Petitioner that he should be careful about the areas he went into in his questioning, so that he did not open the door for the prosecutor to bring in his prior record.  (*Id.* at 63-64.)  The court then called the jury back, advised them that Petitioner had made the decision to represent himself, as he had an absolute right to do, and instructed them that fact of Petitioner's decision should not affect their decision in any way.

Ian Townsend testified that he was the supervisor at the Kava House in Eastown.  (*Id.* at 65.)  On October 6, 2004, at about 3:30 or 4:00 p.m., he received a call from a young woman who identified herself as a customer.  She told him about an incident that had happened at another coffee shop the previous evening, and she gave him a description of the man who had exposed himself to her friend.  Townsend gave the description to his co-worker and asked if she thought of anyone who fit the description.  She was positive that she could.  Five minutes later, a man who matched the description came into the shop.  The man was a somewhat regular customer of the coffee house.  (*Id.* at 66.)  Townsend identified Petitioner as that man.  (*Id.* at 67.)  Townsend observed Petitioner's behavior, as he sat on the outdoor patio with an issue of Music Review.  Petitioner sat very close to a group of young girls, aged between 16 and 20 years.  Townsend performed a variety of tasks that would not draw attention to himself, but would permit him to watch Petitioner:  he watered the plants, he took a lengthy break and sat at a table right next to the window overlooking the patio.  (*Id.*

- 20 -

at 67-68.)  Petitioner had a black jacket laid across his lap and he was holding the Music Review with his left hand.  (*Id.* at 68.)  Petitioner's other hand was underneath the jacket.  Townsend saw some motion of Petitioner's right arm, and he found it strange that Petitioner had looked for 20 minutes at the same magazine page that was mostly advertising.  Townsend phoned the police, who responded to his call.  (*Id.* at 69.)

On cross-examination, Petitioner pointed out that, when Townsend was inside the shop, he could only see Petitioner's angled back.  (*Id.* at 70-71.)  Townsend explained that Petitioner was acting suspiciously, quickly crossing his legs and ruffling the paper when Townsend came out to water the flowers.  In addition, he could see that Petitioner's hand was not visible, but his arm was moving, and Townsend stated, "I have a similar anatomy.  I, frankly, can figure out what was going on."  (*Id.* at 72.)  Townsend acknowledged that the day was brisk, but he did not remember many people with jackets on.  (*Id.*)

Grand Rapids Police Officer Bryan Gard testified that he was on patrol with Officer Chuck Anderson during the late afternoon of October 6, 2004.  (*Id.* at 74.)  At 5:28 p.m. he was dispatched to the Kava House on Townsend's call.  He parked his cruiser and, as he was leaving his cruiser, he saw a man matching the description sitting in a chair in front of the Kava House.  (*Id.* at 75-76.)  As Gard started to walk toward the man, the man stood up.  Before he could leave, Gard asked if he could talk to the man, and the man agreed.  They talked around the north side of the cafe.  The man pulled out identification.  Although Gard could see the edge of a Michigan ID card or driver's license, the man handed him a Degage food card with the name "Charles Johnson."  (*Id.* at 77.)  Gard asked if he had official ID, but the man said, "No."  Gard asked if he could just see the wallet.  The man handed him the wallet and Gard extracted the ID, just as the man began to walk

away.  The ID contained the name "Jerome Sueing."  (*Id.* at 78.)  Gard identified the man as Petitioner.  (*Id.* at 78-79.)  Gard asked the man where he was going, and the man told him he was getting his jacket from the seat of the chair.  They walked, with Petitioner leading by five feet.  Petitioner grabbed his jacket and ran away from Gard.  (*Id.* at 79.)  Gard yelled at him to stop, and then followed him, crossing both streets and then running.  His partner had been talking to the person who called, but he joined the chase when he heard Gard yelling.  Gard attempted to tackle Petitioner, but Petitioner dodged him.  (*Id.* at 80.)  Gard then ran alongside Petitioner and sprayed him with mace.  The mace distracted Petitioner long enough for Gard to conduct a dynamic takedown.  After being taken to the ground, Petitioner initially refused to put his hands behind his back, but they pulled his hands out and handcuffed him.  They eventually escorted him to the Kent County Correctional Facility, where he was booked.  As part of the process, they had Petitioner remove his belt.  At that time, they noticed that Petitioner's zipper was down.  (*Id.* at 81-82.)

On cross-examination, Petitioner asked about another officer coming to the cruiser while Petitioner was in the back seat.  Gard explained that, because he had used force on Petitioner, the other officer documented how Petitioner looked by taking pictures.  (*Id.* at 83.)  Gard acknowledged that it was possible that, after a suspect had been tackled to the ground, pepper-sprayed, handcuffed, and thrown inside a vehicle, a man's zipper might come down.  (*Id.* at 86.)

Grand Rapids Police Detective Leslie Brian Smith testified that he worked as a detective in the Family Services Unit.  About a week before trial, the prosecutor's office asked him to go the Common Ground Coffee Shop to take measurements and photographs, two of which were introduced as the People's Exhibit 1.  He measured the distance between where the suspect was

- 22 -

sitting to where the victim was sitting to be 14 feet.  (*Id.* at 87-88.)  Smith acknowledged that the photographs and measurements were taken nearly a year after the offense date.  (*Id.* at 89.)

   The people rested and the jury was excused for the day.  (*Id.*)  The parties then took up several legal issues raised by Petitioner.  Petitioner requested that Officer Katy Heffner be produced the next day, because she was on the prosecutor's witness list.  His request was granted. (*Id.* at 91.)  Petitioner next complained that he had not received as part of the discovery materials the Internal Affairs report concerning Officer Gard's use of force, which he contended violated the discovery order.  (*Id.*)  The prosecutor responded that Petitioner had been charged by the City Attorney's Office with failure to stop on a lawful command of a police officer and providing false information to a police officer, and he had pleaded guilty to the charge.  According to the prosecutor, the materials were discovery for purposes of that case, not the instant case.  The prosecutor indicated that he would try to obtain the report before the next day, but he did not see how it was relevant.  (*Id.* at 92.)  Finally, Petitioner objected to the admission of evidence concerning the events at the Kava House as unduly prejudicial other acts evidence that tended to show propensity.  The court ruled that the evidence was admissible as inextricably intertwined or interrelated with the offense for which Petitioner was charged, citing *People v. Delgado*, 273 N.W.2d 395 (Mich. 1978).  (*Id.* at 93-94.)

   On the morning of the third day of trial, Petitioner took the stand in his own defense. The court advised Petitioner that his direct testimony would be in a narrative form, followed by cross-examination by the prosecutor. (Tr. III at 100.) Petitioner questioned why his advisory counsel could not question him, and the court responded that defense counsel could only do so if Petitioner wished to stop representing himself.  (*Id.* at 100-101.)  Petitioner testified that, on the morning of October 5, 2004, he was picked up early by his friend Henry Thomas, whom he had known for years.

Thomas had recently married and bought a house, and Petitioner had helped him move into the house and to paint the garage, varnish the floors and perform other odd jobs.  Although Petitioner was a paralegal, he was not employed at the time, so he took odd jobs.  Thomas had his own business, and he was hoping to be able to give Petitioner a job if he got certain bids.  On October 5, 2004, Petitioner helped Thomas to varnish one of his floors.  (*Id.* at 101-02.)  Because Thomas went to work at 4:00 p.m., Thomas dropped Petitioner at his home briefly to change clothes, and Thomas returned to pick Petitioner up at about 1:30 or 2:00 p.m.  They then performed a variety of errands before Thomas dropped Petitioner at his sister's home.  (*Id.* at 102-103.)  Petitioner had scraped down his sister Shirley's home in preparation for painting.  He would go to her house every day to see if she had gotten the paint and other supplies necessary to get the job done.  But it was getting cold at this time of year, and Petitioner had warned her that, if she did not get the paint before that week, he could not do the job that year.  (*Id.* at 103-04.)  His sister was home, so they talked for awhile, and he stayed at her home for a few hours, from about 4:00 p.m. to 6:00 p.m.  Petitioner's other sister, Roxanne, also was present.  When Roxanne left, Petitioner had her drop him at his ex-wife's house.  In sum, Petitioner claimed that he was wrongly identified as the perpetrator and that he could not have been present at the Common Ground Coffee House.  (*Id.* at 104.)

On cross-examination, Petitioner acknowledged that he had been to Common Ground before.  He testified that he was at the Kava House the following day merely waiting for his prescription to be filled at a neighboring pharmacy.  He glanced at magazines and books lying around the coffee house and meditated.  (*Id.* at 106-07.)  When the police arrived, Petitioner became scared, because he previously had bad experiences with the police.  He admitted that he gave false identification and knew that was a crime, but he claimed to have done so out of fear of the officer.

- 24 -

(*Id.* at 106-08.)  Petitioner claimed that he did not know why the officers wanted him, but they had the wrong guy.  When the officer demanded his identification, he was afraid of the officer's manner and was afraid that the officer would jump on him and pull his weapon.  (*Id.* at 109-10.)  Petitioner stated that he had four brothers and five sisters with the same parents, and they all looked alike.  (*Id.* at 111-12.)  Two brothers were in the Grand Rapids area, but one lived in Wyoming and worked at Steelcase, and the other lived on Delaware Street a significant distance away from the coffee house.  (*Id.* at 112.)  Petitioner testified that he had never seen the victim before in his life.  (*Id.* at 113.)

Henry Thomas testified that he had gotten married on September 17, 2004.  Petitioner had been doing work around his house, such as painting, doing the floors, and other tasks.  Every day between 7:00 and 8:00 a.m., Thomas would pick Petitioner up and they would work for three or four hours on the house.  Thomas would then drop Petitioner off at his sister's house, because Thomas had to go to work in the afternoon.  (*Id.* at 117-18.)  On October 5, he dropped Petitioner off at his sister's house a bit early, between 11:00 a.m. and 1:00 p.m.  They also had played a couple of lottery numbers together.  (*Id.* at 118.)  Thomas testified that he had a small company with his brothers, and they had a number of cleaning bids.  He told Petitioner that, when they got some work in, he would give Petitioner a job.  (*Id.* at 119.)  Thomas testified that on Tuesdays and Fridays he worked two jobs, so he had to go into his first job earlier before going to the second one.  (*Id.* at 120.)  The court took judicial notice that October 5, 2004 was a Tuesday.  (*Id.* at 129.)  Thomas would drop Petitioner at his sister's house, but the time would vary between 11:00 a.m. to 1:30 or 2:00 p.m.  (*Id.* at 121.)

Shirley Phillips testified that she presently was employed in the breakfast and lunch program for the Grand Rapids Public Schools, and she ran a day care.  (*Id.* at 122.)  On October 5, 2004, she was not yet employed with the Grand Rapids Public Schools.  (*Id.* at 124.)  On that date,

she saw her brother Jerome, because he had been doing some work on her house.  Thomas would ordinarily drop Petitioner off between 11:00 a.m. and 1:00 p.m., and then Shirley would drop Petitioner off at their sister Roxanne's home between 4:00 and 6:00 p.m., because he did not have a car.  (*Id.* at 122.)  She could say for certain that Petitioner was at her house between 4:00 and 6:00 p.m., because she ran a day care and her children arrived at about 4:50 p.m., so she usually dropped Petitioner off before 4:30, but sometimes she would  wait until the kids arrived before dropping him at her sister's house, which was only a couple of blocks away.  (*Id.* at 122-23.)  On cross-examination, she acknowledged that she had spoken with Detective Smith on the phone.  She told Smith that Petitioner usually arrived at her house between the hours of 9:00 and 11:00 a.m.  (*Id.* at 124.)  Phillips indicated that the routine was the same everyday, and she always dropped him off at her sister's house.  She did not know how he got to Eastown on October 6, 2004.  (*Id.* at 125.)

Roxie Ann Fiddler testified that Petitioner regularly came by her house.  On Sundays he came for dinner, and he would stroll over with his grandson Trinidad in the evening, but most times he came over when Shirley Phillips brought him.  But she could not give an exact date when Petitioner was there and could not say if he was there on October 5 or 6, 2004.  (*Id.* at 128, 132-33.)  Usually Phillips called before bringing Petitioner over, and it was after 4:00 p.m., when Phillips' children got off the school bus.  Sometimes, it would be after 5:00 p.m.  (*Id.* at 129.)  From early September until Petitioner's birthday on October 19, 2004, Petitioner came most days.  Fiddler was helping Petitioner do some things, like getting his driver's license.  (*Id.* at 130.)  Fiddler had no idea if Petitioner went to coffee houses.  (*Id.* at 131.)  Shirley lived just around the corner from Fiddler, and Fiddler would stop in often at lunch time.  Petitioner was more often at Shirley's house than Fiddler's.  (*Id.* at 131-32.)  Fiddler testified that she had never driven Petitioner to a coffee house,

- 26 -

but she had taken him to a store before.  She also had taken Petitioner to the area of Cherry and Charles streets.  (*Id.* at 132.)  She did not know if she took Petitioner to Eastown on October 6, 2004.  She more likely would have taken him to the Cherry and Charles area, where his ex-wife and several of his grandchildren lived.  (*Id.* at 133.)

Following the closing arguments and jury instructions, Petitioner objected to the language of the instruction concerning the limitations on how the jury could use the evidence about October 6, 2004 to find Petitioner guilty of the offense for which he was charged, which occurred on October 5, 2004.  The court denied the objection.  (*Id.* at 189.)

At the conclusion of trial, on September 28, 2005, the jury found Petitioner guilty of indecent exposure.  (*Id.* at 190-91.)  After the jury was excused, the court took up the next phase of the proceeding, regarding the charge of being a sexually-delinquent person and the notice of being a fourth felony offender.  (*Id.* at 192.)  The court advised Petitioner that the charge of being a fourth felony offender was substantially an administrative decision for the court.  In contrast, Petitioner had three options for proceeding on the offense of being a sexually-delinquent person:  he could plead guilty, request a jury trial, or request a bench trial.  The court noted that Petitioner had pleaded guilty two years earlier to the same offense.  (*Id.* at 192.)  Petitioner requested a jury trial.  (*Id.* at 193.)  He also placed his objection on the record to the prosecutor's use of a coat during jury arguments to illustrate Mr. Campbell's testimony, which the court noted and opined that the motions were proper.  (*Id.* at 195-96.)  In addition, Petitioner lodged a request to use the law library to represent himself.  (*Id.* at 196.)

On December 12, 2005, Petitioner, who was represented by counsel, pleaded guilty to being a sexually delinquent person, in exchange for dismissal of the fourth-felony-offender

charges and a minimum sentence of five to eight years, below the guidelines range of nine to thirty

years.  (Plea Tr. at 5-6, docket #42.)  Petitioner admitted that he previously had been convicted five

times for indecent exposure over a number of years.  (*Id.* at 8.)

At the sentencing hearing held on August 3, 1994, defense counsel lodged a number

of objections to the presentence report, all of which were accepted by the court.  (Sentencing

Transcript, (S. Tr.) at 3-6, docket #43.)  The court also received Petitioner's *pro per* motion for new

trial.  The court sentenced Petitioner to serve a prison term of five to eight years, in accordance with

the plea agreement, noting that the sentence was well below the guidelines and far below the

statutory maximum of life imprisonment.  (*Id.* at 10.)

Petitioner filed a motion for new trial, which was docketed in the Kent County Circuit

Court on January 18, 2006.  On February 2, 2006, Petitioner's motion was denied.  (*See* Register of

Action, docket #34.)  Petitioner filed a notice of appeal, and the State Appellate Defenders Office

was appointed to represent Petitioner.  Appellate counsel filed a second motion for new trial on

August 10, 2006, which argued that the court had failed to adequately advise Petitioner, and

therefore Petitioner had not properly waived his right to counsel at trial.  (*Id.*)  At a hearing held on

October 13, 2006, the court denied the motion, concluding that it had bent over backwards to

accommodate Petitioner's uncertainty about self-representation and that Petitioner ultimately had

made a knowing decision based upon considerable information.  (10/13/06 Hr'g on Mot. for New

Trial, docket #44.)

### B.   Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on December 13, 2006, raised the single issue of whether Petitioner was denied

his right to counsel at a critical stage of the proceedings where there was no valid waiver of counsel.

(*See* Def.-Appellant's Br. on Appeal, docket #47.)   On March 2, 2007, Petitioner filed a *pro per*

supplemental brief on appeal, raising five additional claims:

1.   WHETHER DENIAL OF DEFENDANT'S REQUEST TO RECALL WITNESSES FOR FURTHER EXAMINATION DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS-EXAMINE HIS ACCUSER AT TRIAL?

2.   IS IT PROPER FOR DEFENSE COUNSEL TO ANNOUNC[E] THAT HE IS "SATISFIED" WITH THE JURY WITHOUT PRIOR APPROVAL OR CONSULTATION WITH HIS CLIENT?

3.   WHETHER THE TRIAL COURT ERRED BY DENYING DEFENDANT'S REQUEST FOR A "LINEUP" PRIOR TO HIS PRELIMINARY EXAMINATION?

4.   WHETHER DEFENDANT WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL (1)[] FAILED TO FILE ANY PRETRIAL MOTIONS, (2)[] FAILED TO REQUEST A LINEUP PRIOR TO THE PRELIMINARY EXAMINATION; (3)[] ANNOUNC[]ED THAT HE WAS "SATISFIED" WITH THE JURY, WITHOUT DEFENDANT'S PRIOR APPROVAL OR CONSULTATION; (4)[] FAILED TO ASK SPECIFIC QUESTIONS DURING CROSS-EXAMINATION; (5) FAILED TO INTERVIEW AND SUBPOENA INFORMATION HE OBTAINED ON DISCOVERY?

5.   WHETHER DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF ACCESS TO THE COURTS, WHERE THE KENT COUNTY CORRECTIONAL FACILITY DENIED HIS MANY REQUESTS FOR ACCESS TO THE LAW LIBRARY AND NECESSARY LEGAL MATERIALS IN ORDER TO ALLOW HIM TO PROPERLY ASSIST IN HIS DEFENSE WHEN HE HAD COUNSEL AND DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO PREPARE A DEFENSE AND PROPERLY REPRESENT HIMSELF AT TRIAL?

(Appellant's Supp. Br. on Appeal, docket #47.)  By unpublished opinion issued on August 16, 2007,

the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions

and sentence.  (*See* 8/16/07 Mich. Ct. App. Opinion (MCOA Op.), docket #47.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims raised before and rejected by the Michigan Court of Appeals.  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered on December 30, 1997, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #48.)

### C.    Post-conviction relief

Petitioner filed a motion for relief from judgment on April 30, 2009,[5] raising 24 claims.  In a lengthy order issued on July 22, 2009, the Kent County Circuit Court denied all claims.  (7/22/2009 Cir. Ct. Ord, docket #49.)  Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court.  Those courts denied leave to appeal for failure to demonstrate entitlement to relief under MICH. CT. R. 6.508(D), on October 21, 2009 and March 29, 2010, respectively.

### D.    Federal habeas petitions

On or about October 1, 2008, Petitioner filed an application for habeas relief raising nine grounds for relief,[6] some of which contained multiple sub-parts.[7]

---

[5]The motion for relief from judgment was filed two days after Petitioner's federal habeas statute of limitations expired.

[6]The Court inadvertently and erroneously stated in its opinion and judgment dismissing the action for lack of exhaustion that Petitioner had raised eight, rather than nine, claims.

[7]In its opinion and judgment, the Court noted that Plaintiff had raised only four claims of ineffective assistance of trial counsel on direct appeal, but raised nineteen claims of ineffective assistance of trial counsel in his original habeas petition.  As he did in his state-court motion for relief from judgment, Petitioner now raises twenty-four claims of ineffective assistance of counsel in his amended petition.

1.  WHETHER THE TRIAL COURT DENIED MR. SUEING HIS CONSTITUTIONAL RIGHT TO COUNSEL AT "CRITICAL-STAGES" OF THE PROSECUTION WHERE THERE WAS NO VALID WAIVER OF COUNSEL.

2.  WHETHER DENIAL OF DEFENDANT'S REQUES[]T TO RECALL WITNESSES FOR FURTHER EXAMINATION DEPRIVED DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS EXAMINE HIS ACCUSER AT TRIAL?

3.  WHETHER THE TRIAL COURT ERRED BY DENYING DEFENDANT'S REQUEST FOR A CORPORAL "LINEUP" PRIOR TO HIS PRELIMINARY EXAMINATION?

4.  DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

5.  DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF ACCESS TO THE COURTS, WHERE THE KENT COUNTY CORRECTIONAL FACILITY DENIED HIS MANY REQUESTS FOR ACCESS TO THE LAW LIBRARY AND NECESSARY LEGAL MATERIALS IN ORDER TO ALLOW HIM TO PROPERLY ASSIST IN HIS DEFENSE WHEN HE HAD COUNSEL AND DEPRIVED HIM OF HIS CON[]STITUTIONAL RIGHT TO PREPARE A DEFENSE AND PROPERLY REPRESENT HIMSELF AT TRIAL.

6.  DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO SET FORTH A DEFENSE BY TRIAL COUNSEL'S FAILURE TO SUBPOENA AN "IDENTIFICATION" EXPERT TO TESTIFY AT HIS TRIAL.

7.  THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL AT A "CRITICAL-STAGE" OF THE PROCEEDINGS WHEN THE COURT HAD DEFENDANT "TELL HIS SIDE OF THE STORY" IN A NARRATIVE FASHION THAN THROUGH EXAMINATION BY COUNSEL.

8.  THE PROCESS USED TO ALLOCATE PROSPECTIVE JURORS FROM A MASTER SOURCE LIST TO THE CIRCUIT COURT VENIRES VIOLATED DEFENDANT'S SIXTH AMENDMENT [G]UARANTEE OF AN IMPARTIAL JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

9.      THE DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO APPEAL FROM HIS CRIMINAL CONVICTION WHEN THE CLERK OF THE COURT "REFUSED" TO ACCEPT HIS "MOTION FOR RECONSIDERATION" FOR FILING IN THE MICHIGAN COURT OF APPEALS.

(Attach. to Pet., docket #1-1, PageID ##17, 21, 25, 28, 30, 35, 38, 40, 43.)  In an opinion and

judgment issued on October 31, 2008 (docket #5), the Court dismissed the petition without prejudice

because it was a mixed petition that raised both exhausted and unexhausted claims.  The Court held

that the first five of Petitioner's habeas grounds were exhausted on direct appeal, with the exception

of 15 of the 19 claims of ineffective assistance of counsel set forth in his fourth habeas ground.  In

addition, the Court concluded that Petitioner's sixth and seventh habeas grounds had been raised for

the first time in the motion for reconsideration that he attempted to file in the Michigan Court of

Appeals, which was rejected by that court.  Petitioner's eighth ground for habeas relief was not

exhausted because, as Petitioner acknowledged, the issue was merely mentioned, not argued, in his

supplemental brief on appeal and was thereby abandoned under state law.  Because Petitioner had

approximately six months remaining in his statute of limitations, the Court also denied Petitioner's

motion to stay the petition and hold it in abeyance pending Petitioner's exhaustion of his remaining

claims by way of a motion for relief from judgment in the state circuit court and his appeal of any

decision through the Michigan Supreme Court.

On April 24, 2009, four days before the expiration of his habeas statute of limitations,

Petitioner filed a motion (docket #8), which he asked to be considered as a motion for stay and

abeyance, a motion for guidance, a motion to extend the time for filing his habeas petition, or a

motion to consider the exhausted issues raised in his original petition.  He argued that he needed to

be thorough because he only had one opportunity to file such a motion and one opportunity to file

a habeas petition.  Petitioner stated that he had no way to complete his 23-count motion for relief from judgment before the expiration of the statue of limitations.  He therefore asked this Court to "set aside the statute of limitations" mandated in 28 U.S.C. 2244(d)(1).  (*Id.* at 5, PageID #93.)

Given that the case had been closed for six months, the Court considered the filing as a motion for relief from judgment under FED. R. CIV. P. 60(b).  The Court denied the motion for failure to meet the requirements of the rule (docket #10).  The Court advised Petitioner that his only remedy was to file a new petition and to seek equitable tolling of the statute of limitations.  Petitioner appealed the Court's decision (Case No. 09-1671).

Petitioner filed a new habeas petition on or about May 16, 2009, raising only his exhausted claims.  *See Sueing v. McKee*, No. 1:09-cv-479 (W.D. Mich.).  The Court dismissed the petition as time-barred, after denying Petitioner equitable tolling.  *Id.* (docket #6, 7) (Op. & Ord. Nov. 17, 2009).  Petitioner also appealed that dismissal (Case No. 09-2511).  The Sixth Circuit consolidated the two appeals.

In an order issued on October 26, 2012 (docket #21), the Sixth Circuit ruled in Case No. 09-1671 and dismissed as moot Case No. 09-2511.  In its decision, the court acknowledged that Petitioner had failed to demonstrate entitlement to an order granting stay and abeyance pending Petitioner's exhaustion of his claims in the state court.  However, the court held that, rather than considering the motion filed in this case under Rule 60(b), the Court should have considered the motion to be a new habeas petition.  The Sixth Circuit therefore remanded the action to this Court with direction to order Petitioner "to file an amended petition stating all of his exhausted claims, including those which he exhausted in the motion for relief from judgment filed in state court.

Claims that arise from a 'common core of operative facts' relate back to Petitioner's timely petition." (*Id.* at 7, PageID #171 (citing *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011)).)

After remand, Petitioner filed an amended petition that contains 26 claims, with many sub-parts.

Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the

- 34 -

decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th

Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.   Relation Back

Because Petitioner's statute of limitations expired on April 28, 2009, the claims raised only in Petitioner's motion for relief from judgment, which was filed on April 30, 2009, ordinarily

would be barred by the statute of limitations. However, the Sixth Circuit held in its order remanding the case to this Court that Petitioner was entitled to file an amended petition containing the grounds now exhausted after both direct and collateral review that "relate back" to his original petition. Amendments made after the one-year statute of limitations has run relate back to the date of the original petition "if the new claims share a 'common core of operative facts' with the petition." *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011) (quoting *Mayle v. Felix*, 545 U.S. 644, 664 (2005)). Claims that merely add detail to previously raised issues will be considered to relate back. *See id.* at 819.

In his original petition, Petitioner raised only nine total grounds, which substantially parallel the first nine grounds of the instant petition, except that Petitioner no longer raises Ground 9 of his original petition, which challenged the court of appeals' denial of his *pro per* motion for reconsideration. Petitioner, however, has divided his claims of ineffective assistance of counsel (Ground 4 of the initial petition) into two grounds: Ground 4 of the amended petition contains six claims of ineffective assistance, all of which were raised on direct appeal, but were not raised in his initial petition in this Court. In Ground 6, Petitioner raises 24 claims of ineffective assistance of trial counsel, only 19 of which were raised in his initial petition. It appears, however, that the last page of Petitioner's original argument concerning ineffective assistance of counsel, which contains claims 20 to 24, was mistakenly left out of Petitioner's initial petition and brief in support, given that Petitioner used the identical language and argument in his motion for relief from judgment and in his amended petition. Because the state courts have reviewed the claims and because the error appears to have been inadvertent, I will consider all 24 of Petitioner's claims of ineffective assistance of counsel contained in Ground 6 to relate back to the initial petition.

I have reviewed the 17 remaining grounds for relief presented in Petitioner's amended habeas petition and conclude that all of them rely upon new facts, outside the "common core of operative facts" of the claims raised in the initial petition. As a result, I conclude that Grounds 10 through 26 do not relate back to Petitioner's initial habeas application, and they are therefore time-barred.

## II.   Ground 1:  Denial of Counsel

In his first ground for habeas relief, which was the only ground raised by appellate counsel on direct review, Petitioner contends that he only represented himself at trial because of his dissatisfaction with his defense attorney. Moreover, he contends that the trial court did not adequately warn him about the dangers of self-representation. For both reasons, he contends that he did not make an unequivocal waiver of his right to counsel. In addition, he argues that his stand-by attorney, required by MICH. CT. R. 6.005(D)(1), did not communicate with him at trial and did not provide useful advice. Further, he contends that the court did not instruct Petitioner in advance that he would have to testify for the jury in a narrative fashion, rather than responding to questions asked.

To the extent that Petitioner claims that his stand-by attorney did not meet the requirements of MICH. CT. R. 6.005(D)(1), his claim is not cognizable on habeas review. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). It is not the

province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). As a consequence, standby counsel's failure to comply with the Michigan court rules is a non-cognizable, state-court claim.

With respect to his constitutional claim, the Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance of counsel in his defense. *See* U.S. Const. amend. VI; *see also Faretta v. California*, 422 U.S. 806, 832-34 (1975)*; Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 154 (2000). This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself. *Faretta*, 422 U.S. at 832-34; *see also United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'") (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta*, 422 U.S. at 817.

Given the importance of the right to counsel, however, a defendant's request for self-representation must be unequivocal and his waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent. *See Faretta*, 422 U.S. at 834-35; *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938). For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835

(quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Whether a defendant's choice was made with "eyes open" generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst,* 304 U.S. at 464-65. The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the right to counsel."[8] *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005). However, less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'" *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

In addition, the Supreme Court has recognized that the right to self-representation "'is not absolute.'" *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (holding that in the context of prior issues of mental competency may permit a state to limit the right of self-representation) (quoting *Martinez*, 528 U.S. at 162). As the *Faretta* Court itself observed, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." 422 U.S. at 834 n.46 (internal quotation omitted). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer. *Martinez*, 528 U.S. at 162 (holding that the right of self-representation does not apply on direct appeal in a criminal case). For example,

---

[8]The Court notes that the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in *1 Bench Book for United States District Judges* 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney. *King v. Bobby,* 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987). However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent. *King,* 433 F.3d at 492. Accordingly, a state court need not follow any prescribed script in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel. *Id.* Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver. *Id.*

courts may require that a defendant make his request to represent himself in a timely fashion.  *Id.*

In addition, a court may appoint standby counsel even without the express consent of the defendant.

*Id.*   Nevertheless, a court is not required to appoint standby counsel or permit "hybrid"

representation.  *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Further, the trial judge need not

provide personal instruction on procedure or otherwise assist the defendant.  *Martinez*, 528 U.S. at

162 (citing *McKaskle*, 465 U.S. at 183-84).   Moreover, the trial judge may terminate self-

representation by a defendant who deliberately engages in serious and obstructionist misconduct.

*Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337, 342 (1970) (holding that a

defendant's right to confront witnesses may be overcome by the defendant's engagement in

disruptive conduct)).

      The Michigan Court of Appeals recognized and relied upon this established Supreme

Court precedent to conclude that Petitioner had been properly and fully advised and had

unequivocally waived his right to counsel:

> Defendant first argues that he was deprived of his right to counsel where he did not equivocally waive his right to counsel, and that the trial court abused its discretion in granting his request to exercise his right to self-representation.  We review for clear error a trial court's finding whether the defendant's waiver of counsel was knowing and intelligent.  *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004).  We review de novo as a question of law the determination of the meaning of a knowing and intelligent waiver.  *Id.*  We review for an abuse of discretion a trial court's decision to permit a defendant to represent himself.  *People v Hicks*, 259 Mich App 518, 521; 675 NW2d 599 (2003).

> The Sixth Amendment provides defendants with the right to counsel at all critical stages of the criminal process.  *Williams*, *supra* at 641; US Const, Am VI. The Sixth Amendment right to counsel is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963); US Const XIV.  Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights.  *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 2d 1461 (1938).  However, the

United States Constitution does not force a lawyer upon a defendant, and a criminal defendant may choose to waive representation and represent himself. *Iowa v Tovar*, 541 US 77, 87-88; 124 S Ct 1379; 158 L Ed 2d 209 (2004). Invalidly permitted self-representation resulting in a complete deprivation of the right to counsel at a critical stage of the proceeding is structural error requiring reversal, but a limited deprivation can be harmless error. *People v Willing*, 267 Mich App 208, 224; 704 NW2d 472 (2005).

The right of self-representation is provided for in Const 1963, art 1, § 13 and MCL 763.1. A trial court must make certain findings before granting a defendant's request to waive his right to counsel. *Williams*, supra at 642. First, the request to waive the right to counsel must be unequivocal. *Id.* Additionally, the trial court must be satisfied that the waiver is knowingly, intelligently, and voluntarily made, and the trial court should inform the defendant of the potential risks involved in self-representation. *Id.* Finally, the trial court must be satisfied that the defendant's self-representation will not be disruptive, burdensome, or amount to an undue inconvenience. *Id.* "A waiver is sufficient if the defendant 'knows what he is doing and his choice is made with eyes open.'" *Id.*, quoting *Adams v United States ex rel McCann*, 317 US 269, 279; 63 S Ct 236; 87 L Ed 2d 268 (1942).

MCR 6.005(D)(1) sets out the proper procedure regarding a defendant's waiver of the right to counsel. The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first:

> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

Before trial, defendant moved, in propria persona, to discharge his attorney and requested that he be allowed to represent himself, based on his experience as a paralegal. The trial court did not rule on the motion. Following jury selection, defendant again expressed his dissatisfaction with his attorney, and asked the trial court to rule on his pretrial request to represent himself, but after a discussion with the trial court, he decided to keep his appointed counsel. At trial the following day, the prosecutor and defense counsel gave their opening statements, and the prosecutor examined, and defense counsel cross-examined, two witnesses. Defendant then decided to waive his right to counsel and exercise his right to self-representation.

- 42 -

The record reveals that defendant's request to waive his right to counsel was ultimately unequivocal. *Williams*, *supra* at 642. Defendant maintains that he only represented himself because of his dissatisfaction with defense counsel, and relies on *Willing*, *supr*a at 220-223, to support his argument that his waiver was equivocal. However, in Willing, the defendant "never expressed the desire to represent himself or to waive his right to counsel before the trial court." *Id.* at 221. Rather, "the only thing [the defendant] said on the subject was that he would either like an adjournment in order to retain another attorney or, alternatively, another court-appointed attorney." *Id.* Here, although defendant expressed his dissatisfaction with defense counsel, he did not seek another attorney, and instead repeatedly expressed the desire to represent himself. Therefore, we conclude that *Willing* is not applicable here.

Further, the record reflects that defendant weighed his options, and decided whether to exercise his right to counsel or to waive his right to counsel and represent himself. Defendant vacillated between his two options on the first and second day of trial, but ultimately decided to represent himself with his attorney as standby counsel. "[A] request for self-representation can be accompanied by a request for standby counsel and maintain its unequivocal nature." *Hicks*, *supra* at 528. Indeed, "[p]ermitting defendant, equipped with the benefit of hindsight, to retract his clearly stated desire to represent himself solely because he requested standby counsel is tantamount to permitting him to harbor an appellate parachute[.]" *Id.* at 530.

The record also reveals that the trial court apprised defendant of the danger of self-representation, and that defendant's waiver of his right to counsel was knowing, intelligent, and voluntary. *Id.* Defendant presented as an astute layperson with a legal background. Defendant demonstrated his familiarity with case law and court rules, and the trial court recognized as much. Defendant fully contemplated the consequences of his decision, and his waiver was sufficient because he 'kn[e]w what he [wa]s doing and his choice [wa]s made with eyes open.'" *Id.*, quoting *Adams*, *supra*, 317 US at 279. Implicit in the trial court's grant of defendant's request to waive his right to counsel was a determination that defendant's self-representation would not disrupt the trial proceedings. *Id.*

Additionally, the record reflects that the trial court complied with the requirements set out in MCR 6.005(D). The trial court complied with MCR 6.005(D)(1) by advising defendant of "the charge [and] the maximum possible prison sentence for the offense." The trial court also complied with MCR 6.005(D)(1) by advising defendant of "the risk involved in self-representation." Finally, the trial court complied with MCR 6.005(D)(2) by offering defendant "the opportunity to consult with an appointed lawyer."

- 43 -

> "Defendant was fully apprised of the risks he faced by choosing to represent himself and he knowingly and voluntarily chose to accept them.  He may not now be heard to complaint about his choice." *Williams*, *supra* at 645.

> To permit a defendant in a criminal case to indulge in the charade of insisting on a right to act as his own attorney and then on appeal to use the very permission to defend himself in pro per as a basis for reversal of conviction and a grant of another trial is to make a mockery of the criminal justice system and the constitutional rights sought to be protected. [*Id*[.] (Internal citation and quotation omitted).]

(MCOA Op. at 2-3.)

The court of appeals' decision was entirely reasonable.  As I fully discussed when outlining the facts of the case, the trial court had at least three extended discussions with Petitioner, telling Petitioner that self-representation was ill-advised, that his appointed counsel was skilled and competent, and that, despite the fact that Petitioner had an unusual amount of legal knowledge and was a self-described paralegal, he would still be better off being represented by trial counsel.  (*See* Tr. I at 71-76, 83-88; Tr. II at 55-64.)   Petitioner himself described at some length his own experience representing himself and others and his knowledge of the Rules of Evidence and other procedural rules.  (*See* Tr. I at 84-86.)  Petitioner acknowledged that even such stellar attorneys as Clarence Darrow, F. Lee Bailey and Johnnie Cochran hired attorneys to represent them when they were accused of violating the law.  (*Id.* at 84.)  Even after the court explained that Petitioner would not be permitted to recall the two witnesses who had been dismissed, Petitioner stated unequivocally that he wished to represent himself.  (Tr. II at 62.)  In addition, after some further discussion by the prosecutor about statements made by Petitioner during the colloquy about self-representation, the court warned Petitioner about the dangers of making statements that might waive his right to remain silent.  Petitioner unequivocally reconfirmed his intent to represent himself.  (Tr. II at 63-64.)

- 44 -

Finally, Petitioner's complaints about the unhelpfulness of stand-by counsel does not undermine the voluntary nature of his waiver.  As discussed, Petitioner had no constitutional right to stand-by counsel.  *McKaskle*, 465 U.S. at 183.

Under all of these circumstances, the state-court's determination that Petitioner had properly waived his right to counsel not only constituted a reasonable application of clearly established Supreme Court precedent, but also was patently correct.

III.    Ground 2:  Right of Confrontation

In his second ground for habeas relief, Petitioner contends that he was deprived of his right to confront the witnesses against him, in violation of the Confrontation Clause of the Sixth Amendment.  He claims that he was entitled to recall the two witnesses who already had testified and been dismissed prior to his invocation of his right to represent himself.

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. CONST., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment).  The Supreme Court long has read this right as securing an adequate opportunity to cross-examine adverse witnesses.  *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895), and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)).  As the Supreme Court early held,

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge

by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox*[, 156 U.S. at 242-43.]

*Mattox*, 156 U.S. at 242-43, *quoted in California v. Green*, 399 U.S. 149, 157-58 (1970). While the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see also United States v. Adams*, 722 F.3d 788, 834 (6th Cir. 2013); *King v. Trippett*, 192 F.3d 517, 524 (6th Cir. 1999).

Applying this established precedent, the Michigan Court of Appeals thoroughly addressed the question, as follows:

A defendant has a constitutional right to confront the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. "If a defendant has been limited in his ability to cross-examine the witnesses against him, his constitutional right to confront witnesses may have been violated." *People v Ho*, 231 Mich App 178, 189; 585 NW2d 357 (1998). However, "[t]he right of cross-examination is not without limit; neither the Confrontation Clause nor due process confers an unlimited right to . . . cross-examine on any subject." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). "The right of cross-examination . . . may bow to accommodate other legitimate interests of the trial process . . . ." *Id.* Indeed, "'[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.*, quoting *Delaware v Van Arsdall*, 475 US 673, 679; 106 S Ct 1431; 89 L Ed 2d 674 (1986).

At trial, after the first two prosecution witnesses were examined by the prosecutor and cross-examined by defense counsel, defendant informed the trial court that defense counsel failed to ask the witnesses a list of questions he provided to

- 46 -

defense counsel.  Defendant then indicated that he wanted to represent himself from that point forward, and that he wanted to recall the witnesses and ask them certain questions.  Defense counsel indicated that he addressed all of the issues contained within the questions provided by defendant, except for one of a questionable sexual nature directed to the victim.  The trial court confirmed that all of defendant's questions had been covered by defense counsel, and ruled that it was unnecessary to re-call the witnesses.

The record reveals that defense counsel cross-examined the witnesses on all relevant issues, thereby satisfying defendant's right to confrontation.  Further, "[a] defendant who elects to proceed in propria persona after proceedings are underway . . . is not entitled to retry the case."  *Williams*, *supra* at 643; MRE 611(a).  The trial court properly exercised its discretion in imposing reasonable limits on cross-examination, specifically noting that the questions defendant sought to ask were redundant and cumulative.  *Adamski*, *supra* at 138.  To the extent defendant argues that he should have been allowed to recall the witnesses for further cross-examination because the trial strategy changed, the record refutes his assertion.  Defendant maintained throughout the entire proceeding that he was not present when the crime occurred and that it was simply a case of mistaken identity.  The record also belies defendant's assertion that the trial court *required* him to submit his list of questions and erroneously *shared* that list with the prosecutor.  In fact, defendant sua sponte proffered his list of questions to the trial court, stating[,] "I gave [defense counsel] a list of questions right here.  *You can put them in the record if you want to*."  Further, the record does not support defendant's assertion that the trial court supplied his list of questions to the prosecutor.  Rather, the prosecutor only addressed questions that defendant and defense counsel earlier discussed on the record.  A "'[d]efendant should not be allowed to assign error on appeal to something which [he] deemed proper at trial.  To do so would allow defendant to harbor error as an appellate parachute.'"  *People v Milstead*, 250 Mich App 391, 402 n 6; 648 NW2d 648 (2002), quoting *People v Roberson*, 167 Mich App 501, 517; 423 NW2d 245 (1988).  Defendant was afforded his constitutional right to confront his accuser, and the trial court properly exercised its discretion in denying defendant's request to recall two excused witnesses for additional cross-examination.

(MCOA Op. at 3-4 (emphasis in original).)

The state-court's decision constituted an entirely reasonable application of clearly established Supreme Court precedent.  The state court's discussion of the trial record is fully consistent with the facts I previously recited.  Petitioner did not unequivocally assert his desire to represent himself until after the first two witnesses had been cross-examined by counsel and excused.

- 47 -

The trial court expressly found that the list of questions that Petitioner wanted his attorney to ask had all been covered in cross-examination, with the exception of a single question, asking the victim to describe the penis she saw, on which the court would have upheld an objection.  As I previously discussed, such factual findings are presumed to be correct, absent a contrary showing by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Petitioner has not made such a showing.

Moreover, the record amply supports the state court's decision that Petitioner, through counsel, had a more than adequate opportunity to cross-examine the two witnesses.  While Petitioner might have asked the questions differently, had he been representing himself at the time, counsel fully covered the requisite issues on cross-examination.  But Petitioner elected not to represent himself until after the witnesses were excused.  Petitioner cannot demonstrate that his opportunity for cross-examination was inadequate simply because he wanted a second bite at the apple.

In sum, the state court's decision constituted a reasonable application of established Supreme Court precedent and was based on a reasonable interpretation of the facts.

IV.    Ground 3:  Denial of Corporeal Lineup

In his third ground for habeas relief, Petitioner contends that the district court erred when it denied his motion for a corporeal lineup prior to the preliminary examination.  Both at trial and on appeal, Petitioner contended that he had a right under Michigan law to a corporeal lineup.

As I previously discussed, habeas corpus relief is available only when a conviction is obtained in violation of the federal constitution or law.   *Wilson*, 562 U.S. at 5; 28 U.S.C. § 2254(a)).  A federal court on habeas review may not re-examine state-law determinations on state-law questions.  *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.  The decision of the state courts

on a state-law issue, even in the case on review, is binding on a federal court. *See Wainwright*, 464 U.S. at 84.  Because the state court concluded that the state court properly denied Plaintiff's motion for a corporeal lineup under state law, that determination is final.

Moreover, the United States Supreme Court has never held that a defendant is entitled to a corporeal lineup upon request.  As a consequence, even if Petitioner had raised a federal claim, the state court's result would not be contrary to or an unreasonable application of established Supreme Court precedent.

V.      Ground 5:  Denial of Access to Law Library

In his fifth ground for habeas relief, Petitioner complains that he was denied his right to access the courts and to prepare a defense when he was not allowed to use the law library at the Kent County Jail.  Petitioner's claim has two parts.  First, he contends that jail policy precluded his use of the law library while he was represented by counsel, though he acknowledges that, three weeks before trial, he was allowed to go to the library twice each week for one hour at a time. Second, he contends that the law library to which he gained access was inadequate because it lacked federal case reporters, legal encyclopedias, Shepard's case citators, criminal jury instructions, and reference materials on criminal law.

To the extent that Petitioner complains about his access to the law library during the time he was represented by counsel, his claim is meritless.  Where a defendant is represented by an attorney, his right to due process and to the assistance of counsel are satisfied, and he has no independent right to access the courts.  *See United States v. Smith*, 907 F.2d 42, 44 (6th Cir. 1990); *see also United States v. Walker*, No. 96-1681, 1997 WL 720385, at *3-4 (6th Cir. Nov. 10, 1987).

- 49 -

Moreover, to the extent that Petitioner complains about his access to a law library and the contents of that library after he waived his right to counsel, his claim is unsupported by federal law.  The Sixth Circuit has expressly held that the concept of access to the courts, first articulated in *Bounds v. Smith*, 430 U.S. 817 (1977), does not apply to situations where a criminal defendant is representing himself.  *Smith*, 907 F.2d at 45.  Instead, the concept is subsumed under the right to counsel provided by the Sixth Amendment, which is satisfied by the offer of counsel.  *Id.*  A prisoner who elects to represent himself and knowingly and intelligently waives his right to counsel under *Faretta*, 422 U.S. 806, relinquishes his access to a law library.  *Smith*, 907 F.2d at 45; *see also United States v. Kincaide*, 145 F.3d 771, 778 (6th Cir. 1998).  Recognizing that circuits have split on the issue, the Supreme Court has held that the right of a self-represented defendant to access a law library is not clearly established for purposes of habeas review under the AEDPA.  *See Kane v. Espitia*, 546 U.S. 9, 10 (2006) (citing *Smith*, 907 F.2d at 45).  As a consequence, Petitioner is not entitled to habeas relief on his fifth habeas ground.

VI.     Grounds 4 and 6:  Ineffective Assistance of Counsel

In his fourth and sixth grounds for habeas relief, Petitioner contends that his attorney rendered ineffective assistance in a total of 30 ways.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

## A.    Ground 4

Petitioner raises the following six claims of ineffective assistance of counsel in his fourth ground for habeas relief.

1.  Claims 1 & 2:  Failure to file pretrial motions

In his first claim of ineffective assistance of counsel, Petitioner argues that counsel was ineffective when he failed to file any pretrial motions.  Petitioner identifies only one pretrial motion that counsel should have filed – a motion for a corporeal lineup.  Petitioner's second claim is essentially identical:  counsel should have filed a motion for a corporeal lineup.

As I previously discussed, Petitioner has no constitutional right to a corporeal lineup.  Moreover, state court decisions on state law are binding on this Court.  As a result, any motion filed by counsel would have been meritless.  *See Wainwright*, 464 U.S. at 84.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

2.  Claim 3:  Announcing satisfaction with jury

Petitioner argues that counsel was ineffective when he announced his satisfaction with the jury without consulting Petitioner.  The Michigan Court of Appeals thoroughly addressed the issue, as follows:

> Defendant next argues that his counsel was ineffective for expressing his satisfaction with the jury at the conclusion of voir dire, without first consulting with defendant.  It is well settled that defendants have the ultimate authority to make certain fundamental decisions regarding their case.  *Jones v Barnes*, 463 US 745, 751; 103 S Ct 3308; 77 L Ed 2d 987 (1983).  Specifically, defendants may decide whether to plead guilty, whether to waive a jury, whether to testify in their own defense, and whether to appeal.  *Id.*  Beyond that, nothing suggests that "the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."  *Id.*

"[A]n attorney's decisions relating to the selection of jurors generally involve matters of trial strategy." *People v Johnson*, 245 Mich App 243, 259; 639 NW2d 1 (2001). Defense counsel's decision to express his satisfaction with the jury before exercising the remaining peremptory challenges constituted a matter of trial strategy. And, we will not second-guess matters of trial strategy on appeal. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

(MCOA Op. at 5.)

The state court decision unquestionably was not only reasonable, but correct. The United States Supreme Court has never suggested that a defendant has a fundamental right to approve every strategic decision made by counsel at trial. Indeed, as the state court noted, very few matters require the defendant to have the ultimate decision-making authority. *Jones*, 463 U.S. at 751 (identifying such claims as deciding whether to waive a jury, testify, and appeal). In the context of jury selection, the Sixth Circuit has recognized that "'[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense.'" *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (quoting *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001)). However, only if counsel performs "so deficiently during the jury selection process [] as to deny the defendant his Sixth Amendment right to an impartial jury [may] the defendant [] be entitled to relief on the basis of ineffective assistance of counsel." *See Hanna v. Ishee*, 694 F.3d 596, 616 (6th Cir. 2012) (citing *Holder v. Palmer*, 588 F.3d 328, 338 (6th Cir. 2009)). In order to show counsel was ineffective in failing to strike a juror, Petitioner "must show that the juror was actually biased against him." *Webb*, 385 F.3d at 674.

Petitioner wholly fails to meet this difficult standard, much less to meet the double-deference owed to the state-court's determination of the issue. He argues only that one juror was

friendly with two Grand Rapids Police Department officers, so the juror should have been the subject of a peremptory challenge.[9]  In fact, the juror indicated only that he knew two female officers "pretty well" and that he got along with them "pretty well."  (Tr. I at 44-45.)  But in response to the repeated questioning of both defense counsel and the prosecutor, the juror expressly denied that his friendship would cause him to be more likely to believe the police or would in any way interfere with him fairly deciding the case.  (*Id.* at 44-45.)  Because Petitioner fails to demonstrate actual bias, he cannot show that his attorney was ineffective for failing to strike the juror.

3.      Claim 4:  Failure to ask specific questions

Petitioner next claims that counsel was ineffective in failing to ask specific questions during cross-examination.  Petitioner's brief is devoid of specifics regarding the questions counsel should have asked.  I assume that, as he did in Ground 2 of the petition, Petitioner once again challenges counsel's failure to ask Petitioner's list of questions when cross-examining the victim.  As the trial court held, however, counsel did cover the areas in which Petitioner had questions, and any further questioning in those areas would be duplicative.  (Tr. II at 63.)  The trial court's determination was a finding of fact, which is entitled to deference unless Petitioner shows by clear and convincing evidence that the finding was erroneous.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner has wholly failed to make that showing.

Further, as I concluded in discussing Ground 2 of the petition, Petitioner was not deprived of his right to confront the first two witnesses at trial.  For that same reason, counsel's

---

[9]Petitioner argues that his attorney also should have challenged the jury array as containing insufficient African-Americans and should have challenged Petitioner's ultimately all-white jury.  Because I conclude, *infra*, that Petitioner's challenge to the composition of the jury array fails, counsel cannot have been ineffective for failing to raise the claim. *Smith*, 591 F.3d at 523.

decision not to ask further questions of those witnesses could not have rendered the trial fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (examining the prejudice prong of *Strickland*).

4.      Claim 5:  Failure to interview and subpoena witnesses

In his fifth claim of ineffective assistance of counsel under Ground 6, Petitioner argues that his attorney rendered ineffective assistance when he failed to interview and subpoena certain witnesses.  However, the only witness he names is his ex-wife, Barbara Bell, whom he claims could have provided him an alibi.

The Michigan Court of Appeals rejected Petitioner's claim:

> Defendant also argues that defense counsel was ineffective for failing to interview and subpoena his ex-wife.  Failure to make a reasonable investigation can constitute ineffective assistance of counsel. *McGhee*, *supra* at 626.  It is important to first note that, however, contrary to defendant's assertion, defense counsel did not refer to defendant's ex-wife during opening statement.  While defense counsel specifically mentioned the names of the alibi witnesses, including the ex-wife, during voir dire to make certain that none of the jurors knew the witnesses, he indicated only that he "might be calling" them as witnesses.  During opening statement, however, defense counsel merely stated that the jury was "going to hear from" alibi witnesses, but he did not refer to those witnesses by name.

> The record reveals that defense counsel filed a notice of alibi listing defendant's friend, two of defendant's sisters, and defendant's ex-wife.  At trial, defendant called his friend and two sisters to testify as alibi witnesses.  Defendant claims that defense counsel failed to subpoena defendant's ex-wife.  While there is no record evidence to support or refute his assertion, defendant's ex-wife did not, in any event, testify at trial.  However, the record reveals that the alibi testimony of defendant's ex-wife would not have placed defendant at her house at the time of the incident.  See *People v Moreno*, 112 Mich App 631, 639; 317 NW2d 201 (1981) (matter of trial strategy not to call prospective alibi witnesses where they would not have placed defendant at a different location at the time the crime occurred).  The incident at issue occurred around 4:00 p.m., and defendant was allegedly not dropped off at his ex-wife's house until between 6:00 and 8:00 p.m.  Therefore, even if defense counsel failed to subpoena defendant's ex-wife, we presume it was a matter

- 55 -

of trial strategy, not to be second-guessed with the benefit of hindsight. *Dixon*, *supra* at 398; *Moreno*, *supra* at 639.

(MCOA Op. at 6.)

The state court's determination was patently reasonable. Petitioner himself testified that he spent the morning with Henry Thomas, after which Thomas dropped him at home. Thomas picked him up again at about 1:30 or 2:00. Thomas then allegedly dropped Petitioner at his sister Justine's house at 4:00 p.m., where Petitioner remained for several hours, until after 6:00 p.m., visiting with his sisters Justine and Roxanne. When Roxanne left, Petitioner had her drop him off at his ex-wife's house. (Tr. III at 101-04.) As a result, based on Petitioner's own testimony, Petitioner was not at his ex-wife's house at 4:00 p.m., when he was accused of exposing himself at the coffee house. She therefore could not have provided an alibi for Petitioner without contradicting Petitioner's own testimony. As a consequence, defense counsel acted entirely reasonably in declining to interview or subpoena Petitioner's wife to prove his alibi defense.

5.      Claim 6:  Refusal to provide discovery to Petitioner

Plaintiff claims that his attorney, acting as standby counsel, was ineffective for failing to provide Petitioner with all of the discovery materials. In particular, Petitioner complains that his attorney did not provide him all of the witnesses' prior statements for use on cross-examination. Petitioner also claims that his standby attorney did nothing to assist Petitioner in representing himself.

The Michigan Court of Appeals rejected his claim, holding that Petitioner had failed to demonstrate that, had he received the discovery materials, the outcome of his trial would have been different. That determination is patently correct. Petitioner fails entirely to identify any

- 56 -

information in the witnesses prior statements that would have served as a basis for cross-examination, much less information that would have led to cross-examination sufficient to affect the verdict.    Moreover, Petitioner's complaint about standby counsel does not implicate his constitutional rights, because, as I previously discussed, Petitioner had no constitutional right to stand-by counsel.  *McKaskle*, 465 U.S. at 183.

> ### B.      Ground 6

In Ground 6 of his habeas application, Petitioner contends that his trial attorney rendered ineffective assistance of counsel in 24 ways.  Some of the claims listed in Ground 6 overlap with the claims raised in Ground 4.  Specifically, Claim 1 of Ground 6 concerns counsel's failure to move for a corporeal lineup, a question presented in Claims 1 and 2 of Ground 4.  In addition, in Claims 3 and 6 of Ground 6 parallel Claim 3 of Ground 4, in which Petitioner complained about his attorney's expression of satisfaction with the jury without consulting Petitioner and complains that counsel should have excused the juror who was friendly with police officers.  Further, in Claims 5 and 12 of Ground 6, Petitioner again argues that counsel was ineffective for failing to interview and subpoena his ex-wife, a claim previously raised in Claim 5 of Ground 4.  In addition, Petitioner raises in Claim 5 of Ground 6 his argument that defense counsel was ineffective for failing to provide him with the prior statements of the prosecution's witnesses, as he did in Claim 6 of Ground 4.  Also, as he did in Ground 5 of the petition, Petitioner reargues in Claim 18 of Ground 6 that the denial of access to the law library denied him his Sixth Amendment right to counsel.  Finally, in Claim 22 of Ground 6, Petitioner raises the same argument presented in Claim 5 of Ground 5.  Because these issues have been fully addressed, I will not separately consider Claims 1, 3, 4, 5, 6, 12, 18 or 22 of Petitioner's sixth ground for habeas relief.

1.      Claim 2:  Failure to challenge the photographic lineup

Petitioner argues that counsel was ineffective for failing to challenge the photographic lineup shown to the victim while Petitioner was in custody.  Citing *United States v. Wade*, 388 U.S. 218 (1967), Petitioner contends that the Supreme Court has held that a post-indictment lineup is a critical stage of the proceeding, at which he was entitled to the aid of counsel.  Because the victim was shown a photographic lineup that included a picture of Petitioner, the identification should have been stricken.

*Wade* is inapplicable to the circumstances of this case.  Petitioner was never placed in a physical lineup without representation.  Instead, his photograph was presented (in a packet with others) to the victim, who immediately identified Petitioner.  The Supreme Court has expressly rejected the argument that *Wade* should be extended to photographic lineups.  *See United States v. Ash*, 413 U.S. 300, 317-19 (1973); *see also Moore v. Illinois*, 434 U.S. 220, 227 n.3 (1977) (citing *Ash*); *Van v. Jones*, 475 F.3d 292, 311 (6th Cir. 2007) (same).  Instead, the Court held that, as with other parts of pretrial interviews, the adversary process serves as an adequate remedy for potential abuse.  *Id.* at 318-19.

Because police committed no error by showing the victim a photographic lineup, counsel was not ineffective in failing to raise the issue.  *See Smith*, 591 F.3d at 523 (failure to make a meritless motion does not amount to ineffective assistance of counsel.

2.      Claim 7:  Failure to object to jury venire and jury panel.

Petitioner next argues that his attorney rendered ineffective assistance in failing to object to the composition of the jury venire.  Petitioner separately challenges the composition of the jury venire in his ninth ground for habeas relief, asserting that it deprived him of an impartial jury

drawn from a fair cross-section of the community.  Because I conclude *infra* that Petitioner's ninth ground for habeas relief lacks merit, the instant claim of ineffective assistance of counsel for failing to object to the venire also fails.  *See Smith*, 591 F.3d at 523 (failure to make a meritless motion does not amount to ineffective assistance of counsel).

3.      Claim 8:  Failure to prepare for cross-examination of victim

Petitioner argues that his trial attorney failed to prepare for cross-examination of the victim.  Petitioner provides no specifics about what counsel failed to do or how any failure impacted his case.  In the absence of other particulars, I assume Petitioner reiterates the argument he made in the first and second claims of Ground 4 – that trial counsel erred by failing to ask the list of questions given him by Petitioner at trial.  For the reasons I previously discussed, the claim is meritless.

4.      Claim 9:  Failure to prepare Petitioner on procedure

Petitioner asserts that he was denied the effective assistance of counsel when his standby attorney did not prepare him for his trial testimony, advise him on making objections, explain the court rules and Michigan Rules of Evidence, or instruct him on courtroom decorum.  Petitioner's claim is factually disingenuous, given his assertions at trial that he was extremely familiar with the rules of court and knew the rules of evidence.  Regardless, as I have repeatedly indicated, Petitioner had no right to standby counsel – much less effective counsel – once he decided to represent himself.  *McKaskle*, 465 U.S. at 183.

5.      Claim 10 & Ground 7:  Failure to secure an identification expert[10]

In his tenth claim of ineffective assistance, as in his seventh ground for habeas relief, Petitioner argues that he was denied the effective assistance of counsel when his attorney failed to secure an identification expert to testify at his trial, thereby denying him his right to present a defense.  In its order denying Petitioner's motion for relief from judgment, the trial court rejected the argument as meritless:

> Next, Defendant argues that he was deprived of his right to set forth a defense by trial counsel's failure to subpoena an identification expert to testify at his trial and that trial counsel was ineffective for failing to obtain such an expert.  Defendant argues that MCL 775.15 required this Court to appoint an expert.  Defendant's analysis is erroneous, however, because this Court did not deny the appointment.  Rather, defense counsel opted not to request the expert.  Defendant was able to present his defense without the expert.  He argued misidentification to the jury and presented an alibi defense.  "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense."  *People v. Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).  Because Defendant's defense was raised, his argument is without merit.  See *Id.*
>
> Moreover, in his brief, Defendant asserts that the expert would have testified as to "Unconscious Transference," a process whereby [] "the mind drafts a vaguely familiar face to play a role that could not otherwise be cast."  [Defendant's Brief, p 9.]  However, this runs contrary of Defendant's own theory and testimony at trial that he had never seen the victim before, "I was not the person.  I don't even know this woman.  I never seen [sic] her before in my life."  Defendant cannot take a second bite at the apple and assert a new theory in post-judgment proceedings.

(Cir. Ct. Ord. Den. Relief from J. at 3, docket #49.)

The failure to call witnesses can amount to ineffective assistance where it results in prejudice to the defense.  *See, e.g., Towns v. Smith*, 395 F.3d 251, 258–60 (6th Cir. 2005) (counsel

---

[10]In his seventh ground for habeas relief, Petitioner argues that he was deprived of his right to present a complete defense when counsel failed to subpoena an identification expert.  The issue is identical to Petitioner's tenth claim of ineffective assistance of counsel under Ground 6.  I therefore have consolidated the discussion of both claims here.

ineffective for failing to call a witness who could have created an alternative theory of the case).  The decision whether to call witnesses is a strategic one, entitled to deference.  *Strickland*, 466 U.S. at 689.  Moreover, in *Harrington*, 562 U.S. 86, the Supreme Court emphasized the double deference owed to state-court determinations that the attorney acted reasonably in using cross-examination of the prosecution's witness rather than calling a defense expert.  *Id.* at 89-90.

The state court held that trial counsel acted reasonably in not calling an identification expert and that Petitioner was not denied his right to present a defense.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted).  The central component of the right to present a defense is the right to offer the testimony of witnesses.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Ferensic v. Birkett*, 501 F.3d 469, 475 (6th Cir. 2007).  The right to present a defense, however, is not absolute.  *See Taylor*, 484 U.S. at 409 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *see also Ferensic*, 501 F.3d at 475.

Here, as the state court recognized, Petitioner had ample opportunity to present his defense.  Counsel cross-examined the victim extensively about the accuracy of her identification, and Petitioner presented alibi witnesses, argued misidentification, and testified that he had never seen the victim before.  Moreover, the state court properly observed that, because Petitioner contended that he had never seen the victim before, the possibility that an expert could have talked about the concept of unconscious transference would have been irrelevant to or possibly undermined

- 61 -

Petitioner's theory of defense.   Defense counsel therefore acted reasonably when he opted to undermine the victim's credibility by cross-examination, rather than call an expert.   The mere fact that the jury believed the victim does not render the attorney's decision unreasonable.   Petitioner fails to overcome the double deference owed to the state court's determination of the claim.

6.      Claim 11:  Failure to object to admission of photograph

Petitioner argues that defense counsel was ineffective for failing to object to the admission of a photograph of the "crime scene" that was taken more than a year after the alleged offense.   Petitioner cannot demonstrate that counsel was ineffective, as the trial court held that the photograph was properly admitted:

> Defendant argues that this Court erred in admitting a photograph of the scene that had been taken one year after the incident and had not been disclosed prior to trial. The only foundational requirement for the admission of a photograph is a witness's testimony that it is an accurate representation of the coffee house on the day of the incident.   [Transcript Volume I, 31:21-32:1.]   Therefore, any challenges to the accuracy of the representation pertains to the weight of the evidence, not its admissibility.   *Id.*

(Cir. Ct. Ord. on Mot. for Relief from J. at 5, docket #49.)

In his first nine grounds for relief, the only grounds that are not time-barred, Petitioner has not challenged the actual admission of the evidence.   Even if he had, the argument would be futile.   The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.   28 U.S.C. § 2254(a).   As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."   *Id.* at 67-68.   Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution,

laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  No such fundamental right is at issue here.

Moreover, because the state court found the objection to be meritless, any objection by counsel would have been futile.  Counsel is not required to raise futile objections.  *See Smith*, 591 F.3d at 523.

### 7.      Claim 13:  Failure to investigate and raise all defenses

In his thirteenth claim of ineffective assistance of counsel, Petitioner argues that defense counsel did not "prepare, investigate, and present all substantial defenses, and assert them in a proper and timely manner."  Petitioner provides no further explanation of his claim.  Under these circumstances, Petitioner wholly fails to overcome the presumption that counsel's performance was reasonable.  *Strickland*, 466 U.S. at 689.

### 8.      Claim 14: Failure to appoint new counsel

Petitioner argues in his fourteenth claim that he was denied the effective assistance of counsel when the trial court assigned attorney Dennie to Petitioner's case, because there had been a complete breakdown between Petitioner and Mr. Dennie.  Petitioner, however, never made a firm motion seeking appointment of new counsel.

The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defense." U.S. Const., amend. VI. One element of that right is the right to have counsel of one's choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). However, the right to counsel of choice is not without limits. *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). "'An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.'" *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Thus, where a court is faced with a defendant's request to effect a change in his representation by way of a motion to substitute counsel, the court must determine whether there is good cause for the substitution by balancing "the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996).

Up until the time Petitioner exercised his right to represent himself, Petitioner could not point to any cause warranting the substitution of another attorney. The trial court advised Petitioner that his attorney was competent, and Petitioner made no showing to the contrary. Instead, Petitioner simply complained that the attorney was not proceeding exactly how Petitioner wished.

Such an argument falls far short of overcoming the presumption that counsel's performance was reasonable.

        9.      Claim 15:  Refusal of standby counsel to speak to Petitioner

        In his fifteenth claim of ineffective assistance of counsel, Petitioner again complains about the manner in which his standby counsel assisted him.  Again, as I have discussed, Petitioner's complaints about standby counsel do not implicate his constitutional rights, because Petitioner had no constitutional right to stand-by counsel.  *McKaskle*, 465 U.S. at 183.

        10.     Claims 16 & 17:  Overall ineffective assistance

        In his sixteenth and seventeenth claims of ineffective assistance, Petitioner merely recites the general standards of ineffective assistance of counsel under *Strickland*, 466 U.S. 668, and *United States v. Cronic*, 466 U.S. 648 (1984).  Petitioner identifies no factual basis for his claims. As a result, his conclusory claims of ineffective assistance of counsel should be dismissed as meritless.

        11.     Claim 19:  Low statutory pay rate

        In his nineteenth claim of ineffective assistance of counsel, Petitioner makes a one-sentence claim that the "[s]tatutory pay rate received by his appointed counsel resulted in low-quality representation, depriving him of effective assistance of counsel, due process, and equal protection of the law."  (Am. Pet., docket #25, PageID #206.)  Petitioner's conclusory allegation falls far short of demonstrating either that appointed counsel's performance fell below an objective standard of reasonableness or that Petitioner was prejudiced by counsel's performance.  *Strickland*, 466 U.S. at 488-89.  Moreover, Petitioner utterly fails even to identify the violations of due process and equal

protection he suffered.  As a consequence, I recommend that his nineteenth claim under Ground 6 be denied.

12.    Claim 20:  Failure to subpoena pharmacist or pharmacy video

Petitioner argues in his twentieth claim of ineffective assistance of counsel that counsel failed to subpoena the pharmacist and failed to try to obtain the pharmacy's surveillance video, which would have demonstrated that Petitioner was at the Kava House only to wait for his prescription.  Petitioner wholly fails to demonstrate that counsel's performance was deficient.  The reason for Petitioner's presence at the Kava House was irrelevant to the actions he took there.  It was even less relevant to whether he was at the Common Ground coffee shop the day before.  The state court reasonably rejected Petitioner's claim of attorney error.

13.    Claim 21:   Failure to ask about victim's mental health, medical records, and dating past

Petitioner's twenty-first claim of ineffective assistance of counsel consists of a single conclusory assertion that counsel should have asked Bandstra about her "Mental" history or sour [sic] the victim's medical records and dating past." (Am. Pet., docket #25, PageID #207.) Petitioner fails utterly to demonstrate that the victim had a relevant history or that any such history would be admissible.  Petitioner's conclusory allegation wholly fails to overcome the double deference owed to the state court's rejection of this claim.

14.    Claim 23:   Failure to investigate or subpoena witnesses present at the time of the arrest

Petitioner alleges, again in a conclusory fashion, that defense counsel was ineffective for failing to interview and subpoena other witnesses present at the time of his arrest at the Kava House.  He speculates that one or more of those witnesses could have contradicted the testimony of

Ian Townsend.  Petitioner also asserts that the prosecutor failed to produce these unknown res gestae witnesses as required by MICH. COMP. LAWS § 767.40a(2), and defense counsel erred when he failed to request a missing-witness instruction.

> The trial court rejected Petitioners' claim, as follows:

> Defendant argues that the prosecution failed to produce res gestae witnesses and that defense counsel was ineffective for failing to object.  Apparently, Defendant claims error in that the prosecutor did not learn who the other patrons of the coffee shop were at the time of the incident.  MCL 767.40a does not require the prosecutor to locate each and every res gestae witness.  The prosecutor's duty is only to make available known res gestae witnesses and to provide reasonable assistance in locating additional witnesses upon the request of a defendant. *People v. Perez*, 469 Mich 415, 419; 670 NW2d 655 (2003).  Because the prosecutor did not violate this duty, trial counsel was not ineffective for failing to object to the non-production of res gestae witnesses.

(Ord. Den. Mot. for Relief from J. at 6, docket #46.)

As I previously have discussed, habeas corpus relief is available only for violations of the United States Constitution or federal law.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

The state court has held that the prosecutor was not required under state law to produce every patron of the Kava House coffee shop.  As a consequence, any objection or request for instruction would have been futile.  An attorney is not ineffective for declining to make a frivolous or meritless motion. *Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506.

15.    Claim 24:  Failure to ask victim about photographs

In his final claim in Ground 6, Petitioner complains that his trial attorney was ineffective in failing to ask the victim about whether she had been shown photographs of Petitioner that were taken when he was seated in the patrol car.  He asserts that such photos and a videotape were taken, and he overheard Sergeant Knauss say that he was taking the pictures so that he could show the other victims at the coffee shop and obtain an identification and "get defendant off the streets for good."  (Am. Pet., docket #25, PageID #207.)  Petitioner notes that Sergeant Knauss did not testify at trial and was no longer employed by the Grand Rapids Police Department at the time of trial.

The trial court rejected Petitioner's claim of ineffective assistance of counsel, stating that Petitioner had "failed to explain the relevance of this question or how the outcome would have been different." (*Id.*)  That determination was a reasonable application of Supreme Court precedent.  On direct examination, Bandstra testified that she was shown only one lineup of photographs, from which she promptly identified Petitioner.  (Tr. II at 20-21.)  No basis exists for speculating that asking about whether she was shown pictures taken in the squad car would have elicited a different answer.  Defense counsel instead focused his cross-examination on a more productive ground, asking Bandstra about the photographs that she was shown, inducing her to express uncertainty about the particular layout of those photographs.  (Tr. II at 25-56.)  On redirect, she was shown a photo array, and she testified that she believed it was an accurate copy of what she viewed.  (*Id.* at 34.)  When the prosecutor sought admission of the document, defense counsel asked whether the victim could say for certain saw all the same pictures.  She stated that she was not certain about the photos other than Petitioner's.  She also testified that she believed the photos she was shown were in color, not

- 68 -

black and white, as the photo array shown by the prosecutor.  (*Id.* at 35.)  The judge reserved ruling on the admission, and the photo array was apparently never admitted.  (*Id.*)

In sum, counsel's performance was entirely reasonable, and Petitioner's claim of attorney error is wholly unsubstantiated.  For the same reasons, Petitioner fails entirely to demonstrate prejudice.  For both reasons, Petitioner's claim of ineffective assistance of counsel is meritless.

### VII.    Denial of Counsel at Critical Stage of Proceedings

In his eighth ground for habeas relief, Petitioner argues that he was denied his Sixth Amendment right to counsel at a critical stage of the proceedings when the court required him to deliver his own testimony in a narrative fashion, rather than responding to questions posed by standby counsel.  Petitioner argues that the trial court's decision violated three Supreme Court cases: *McKaskle*, 465 U.S. 168, *Bell*, 535 U.S. 685, and *Mickens v. Taylor*, 535 U.S. 162 (2002).

Petitioner's claim is frivolous.  In *Mickens*, 535 U.S. 162, the Supreme Court addressed the right to a conflict-free attorney, not the right to the assistance of an attorney by a defendant who waives his right to counsel.  The case is wholly inapposite.   Equally inapposite is *Bell*, 535 U.S. 685, where the Supreme Court considered whether counsel's performance during the sentencing phase of a capital case was so deficient as to amount to the denial of counsel at a critical state of the proceeding, warranting a presumption of prejudice under *Cronic*, 466 U.S. 648.

Petitioner's citation of *McKaskle* is apposite to the question, but the Supreme Court's decision in *McKaskle* is directly contrary to Petitioner's assertion.  In *McKaskle*, the Supreme Court held that, if a defendant who elects to represent himself under *Faretta* subsequently is allowed to and does elect to use standby counsel for a limited purpose, he is barred from complaining about

counsel's subsequent performance.  465 U.S. at 183.  The Court held, however, that a defendant who represents himself is not constitutionally entitled to a standby attorney.  *Id.*  Further, the Court ruled that a defendant who elects to represent himself "does not have a constitutional right to choreograph special appearances by counsel."  *Id.*

Because Petitioner elected to represent himself, he had no right to have standby counsel direct the questioning during Petitioner's testimony.  *McKaskle*, 465 U.S. at 183.  The state courts therefore reasonably rejected his eighth habeas ground.

VIII.   Ground 9:  Challenge to Jury Venire

Petitioner argues in his ninth ground for habeas relief that he was denied his Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community.  In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court held that "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from *venires* representative of the community . . . ."  *Id.* at 537.  In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate three elements: (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.  *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  When potential jurors are systematically excluded from the jury pool on the basis of race, structural error occurs.  *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986).  Structural error is not subject to harmless-error review.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991)).

Both at trial and in his motion for relief from judgment, Petitioner referenced a computer glitch that reduced the representation of minority jurors in Kent County jury pools between the spring of 2001 and its discovery in August 2002. Petitioner's jury was not selected until September 27, 2005. The trial court advised Petitioner at the time of his original objection that the computer error had been corrected years before. (Tr. II at 53.) The trial court's determination was a factual conclusion that is entitled to a presumption of correctness that may be overcome only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429. As the trial court noted in rejecting Petitioner's claim in its order denying relief from judgment (docket #46 at 4), Petitioner offers nothing but conclusory allegations to show either that minorities were underrepresented in the jury array or that any underrepresentation was caused by a computer glitch or other systemic exclusionary process. Petitioner therefore falls far short of demonstrating prima facie evidence on his fair-cross-section claim under *Duren*, 439 U.S. at 364.

## Recommended Disposition

Having addressed all of Petitioner's arguments that are properly before the Court, and for the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  October 7, 2015                          /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).